# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

| | | |
|---|---|---|
| OUTMEMPHIS; MICHELLE ANDERSON; JANE DOE 2; JANE DOE 3; and JANE DOE 4, | ) ) ) ) | |
|     Plaintiffs, | ) | |
| v. | ) ) | |
| BILL LEE, in his official capacity as Governor of Tennessee; JONATHAN SKRMETTI, in his official capacity as Attorney General and Reporter of Tennessee; DAVID RAUSCH, in his official capacity as Director of the Tennessee Bereau of Investigation; and FRANK STRADA, in his offical capacity as Commissioner of the Tennessee Department of Correction, | ) ) ) ) ) ) ) ) ) ) ) | |
|     Defendants. | ) | |
| ------------------------------------------------- | ) | **Case Nos.**    **2:23-cv-2670** |
| UNITED STATES OF AMERICA, | ) | **2:24-cv-02101** |
| | ) | |
|     Plaintiff, | ) | **Chief Judge Lipman** |
| | ) | |
| v. | ) ) | |
| STATE OF TENNESSEE, and TENNESSEE BUREAU OF INVESTIGATION, | ) ) ) | |
| | ) | |
|     Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF STATE ENTITIES' MOTION TO DISMISS

### INTRODUCTION

Tennessee law imposes heightened criminal penalties on those who knowingly engage in prostitution that has a risk of spreading HIV.[1]  The State's public-health rationale for doing so is obvious: Because prostitution involves an increased risk of HIV-transmission, Tennessee seeks to discourage such activity by individuals who knowingly carry the virus.  The United States admits that HIV is "very contagious" and has "no effective cure."[2]  Even so, it claims that Title II of the Americans with Disabilities Act—which ensures disabled citizens' equal access to public "services, programs, and activities," 42 U.S.C § 12132—somehow forbids Tennessee from addressing the serious issue of HIV transmission through prostitution.   That position—one first suggested in a law review article[3]—warps the protections of the ADA and invades "the state's prerogative to superintend the public health."  *Kentucky v. Biden*, 23 F.4th 585, 596 (6th Cir. 2022).

But the Court need not even reach the merits.  The Department of Justice lacks any statutory cause of action to pursue this case.  The ADA specifically gives the U.S. Attorney General statutory authority to enforce Titles I and III of the ADA but *not* Title II.  And even if the Court could divine a cause of action, hornbook law establishes that the Department lacks standing to seek an injunction against "Tennessee."

The Department of Justice is not absolved from suing the right people for the right relief with an actual cause of action.  The Court should grant the motion to dismiss.

---

[1] "Most people get HIV through anal or vaginal sex," conduct that Tennessee's law targets.  CDC, *HIV Risk Among Persons Who Exchange Sex for Money or Nonmonetary Items*, http://tinyurl.com/yh7mfwkm (last visited Mar. 25, 2024).

[2] CDC, *HIV Basics*, https://tinyurl.com/y2xw3xbb (last visited Mar. 25, 2024); *see also Bradley v. Jefferson Cnty. Pub. Sch.*, 598 F. Supp. 3d 552 (W.D. Ky. 2022) (allowing "judicial notice of information posted on official public websites of government agencies").

[3] Blecher-Cohen, Joshua, *Disability Law and HIV Criminalization* https://tinyurl.com/4u6zbnjv (last visited Mar. 25, 2024).

## BACKGROUND

The emergence of HIV/AIDS in the 1980s alarmed the medical community because of its devastating effect on "previously healthy persons."[4]  The CDC declared an epidemic in the United States in 1981.[5]  That year saw only 318 new cases of HIV reported, but by 1992, new cases peaked at 75,457.[6]  That period also saw "sharp increases" in the number of HIV-related deaths.[7]  There were only 451 HIV-related deaths in 1981, but by 1992, HIV/AIDS was the number one cause of death for men ages 25 to 44.[8]  Two years later, HIV/AIDS became the leading cause of death for *all* people ages 25 to 44.[9]  In 1995, HIV/AIDS killed 50,628 people in the United States.[10]  During this epidemic, it became well-known that sexual contact was among the most common ways HIV is transmitted.[11]  Thus, it is unsurprising that the risk of HIV is "high" among sex workers.[12]

Against that bleak backdrop, Tennessee, like dozens other States, sought to stem HIV transmission by elevating and adopting penalties for those who engaged in risky conduct while knowingly infected with HIV.[13]  *See* Tenn. Code Ann. § 39-13-516; *see also, e.g.*, Ky. Rev. Stat. § 529.090(2).  In 1991—when HIV was invariably fatal, ranking as the *ninth* leading cause of

---

[4] CDC, *HIV Surveillance --- United States, 1981 – 2008*, http://tinyurl.com/2t5j2unj (last visited Mar. 25, 2024).

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id.*; http://tiny.cc/hf2qxz (last visited Mar. 25, 2024).

[9] *See* http://tiny.cc/kf2qxz (last visited Mar. 25, 2024).

[10] CDC, *HIV Surveillance --- United States, 1981 – 2008*, http://tinyurl.com/2t5j2unj (last visited Mar. 25, 2024).

[11] CDC, *Ways HIV Can Be Transmitted*, http://tinyurl.com/2wmsxvym (last visited Mar. 25, 2024).

[12] CDC, *HIV Risk Among Persons Who Exchange Sex for Money or Nonmonetary Items*, http://tinyurl.com/yh7mfwkm (last visited Mar. 25, 2024).

[13] CDC, *HIV Criminalization and Ending the HIV Epidemic in the U.S.*, https://tinyurl.com/3ytx5mpc (last visited Mar. 25, 2024) (noting that thirty-four states criminalize actions taken by people with HIV through HIV-specific laws).

death in the United States[14]—the State enacted its aggravated prostitution statute to enhance the criminal punishment for those who engage in prostitution while knowingly infected with HIV. 1991 Tenn. Pub. Acts, c. 281, § 2. Prostitution generally is a Class B misdemeanor in Tennessee. Tenn. Code Ann. § 39-13-513(b)(1). Aggravated prostitution, however, is a Class C felony. *Id.* § 39-13-516. Thus, any person who commits prostitution "knowing" that they are "infected with HIV" faces a term of imprisonment "not less than" three years and a fine of up to $10,000. *Id.*; *id.* §§ 40-35-111(3), 40-35-313(a)(1)(B)(i)(c), (ii)(a).

Tennessee later required individuals convicted of aggravated prostitution to register as sex offenders and comply with the requirements of the State's sex-offender registry. *Id.* § 40-39-202(20)(A)(iii), (31)(X). Recognizing the health risks associated with HIV and the pernicious nature of the offense, Tennessee's legislature reclassified aggravated prostitution as a "violent" sexual offense. *Id.* § 40-39-202(31). Those convicted of aggravated prostitution must register under, and comply with, the requirements of Tennessee's Sexual Offender and Violent Sexual Offender Registration, Verification and Tracking Act ("TN-SORA"). *Id.* § 40-39-202(20)(A)(iii), (31)(X). This includes registration with their incarcerating facility within 48 hours before release and regular updates to their information with a registering agency. *See, e.g.*, *id.* § 40-39-203(a)(1), (b), (i). The TBI maintains a database of registered sex offenders in Tennessee and publishes that database to the public. *See id.* §§ 40-39-204(a), -206(a). The TN-SORA also limits where registered offenders may live and work. *Id.* § 40-39-211. Local district attorneys have exclusive power to prosecute criminal violations of those restrictions. *See id.* § 8-7-103(1).

---

[14] *See* CDC, *Update: Mortality Attribute to HIV Infection Among Persons Aged 25-44 Years— United States, 1991 and 1992* (Nov. 19, 1993), http://tinyurl.com/3mjktwmf (last visited Mar. 25, 2024).

While HIV treatments and therapies have advanced in the decades since the virus first appeared, "[t]here is currently no effective cure.  Once people get HIV, they have it for life."[15] HIV-infection inevitably progresses to Acquired Immunodeficiency Syndrome (AIDS), which is typically fatal within three years "[w]ithout HIV treatment."[16]  Thus, as the federal government recognized just a few short years ago in 2019, HIV "remains a significant public health threat" posing "a real threat of… resurgence."[17]  Indeed, the federal government, through its agencies, launched an initiative "to end the HIV epidemic in the United States by 2030."[18]

In a dramatic change of approaches, the federal government now deems Tennessee's law a mere relic of "outdated and unfounded" thinking. (DKT. 1, ¶ 65.)  It insists that States like Tennessee must "modernize" their approach to policing risky, HIV-related activity by criminalizing only conduct where actual "HIV transmission" occurred or converting laws like Tennessee's from a felony to a misdemeanor.[19]  In other words, the federal government *does not disagree* that knowingly transmitting HIV *should be criminalized*, it simply—and troublingly— believes the better *policy* is to wait to see if the victim actually contracts HIV before punishing the offender, or just punish offenders to a lesser degree.

Apparently frustrated that Tennessee, along with these 33 other states, have not ceded to a federal preference to "repeal" these laws,[20] DOJ brought this suit to force the State's hand. The Complaint alleges that Tennessee's aggravated prostitution statute and the associated registry requirements constitute unlawful discrimination under Title II of the ADA. (DKT. 1, ¶¶ 70-74.)

---

[15]  *Id.*; CDC, *HIV Basics*, https://tinyurl.com/y2xw3xbb (last visited Mar. 25, 2024); *see also Bradley v. Jefferson Cnty. Pub. Sch.*, 598 F. Supp. 3d 552 (W.D. Ky. 2022) (allowing "judicial notice of information posted on official public websites of government agencies").

[16] CDC, *HIV Basics*, https://tinyurl.com/y2xw3xbb (last visited Mar. 25, 2024).

[17] HHS, *Ending the HIV Epidemic in the U.S.*, https://tinyurl.com/2c5hjvtn (last visited Mar. 25, 2024).

[18] *Id.*

[19]  CDC, *HIV Criminalization and Ending the HIV Epidemic in the U.S.*, https://tinyurl.com/3ytx5mpc (last reviewed Mar. 25, 2024).

[20] *Id.*

In a facially dubious proposition, the federal government hints that while it may not have violated the ADA initially, Tennessee's law became illegal sometime "since its passage." (DKT. 1, at ¶ 65.) Revealingly, the federal government leaves unsaid when exactly in the last three decades years Tennessee's law began to violate the ADA. The federal government further declines to reconcile how it can attack Tennessee's law while to this day agreeing with the fundamental premise on which it was enacted: the risk of transmitting the disease is "high among persons who exchange sex for money or nonmonetary items."[21]

Nonetheless, the federal government asks this Court to enjoin "Tennessee" from enforcing its laws. (DKT. 1, at 13.) The federal government also seeks compensatory damages on behalf of "a Black transgender woman" from Memphis who pleaded guilty to aggravated prostitution in 2012 and similarly situated individuals. (*Id.* ¶ 43-62.) Tennessee moves to dismiss the Complaint.

## LEGAL STANDARD

Under Federal Rules of Civil Procedure 12(b)(1) and (h)(3), a court "must dismiss" any claim over which it lacks subject matter jurisdiction. A court lacks jurisdiction if a plaintiff has no standing, or if a defendant is immune from suit. *Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017); *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1046 (6th Cir. 2015).

Courts assessing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) must "construe the Amended Complaint in the light most favorable to the plaintiff, accept [the plaintiff's] allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh,* 487 F.3d 471, 476 (6th Cir.2007). "However, 'a legal conclusion couched as a factual allegation' need not be accepted as true on a motion to dismiss, nor are recitations of the elements of a cause of action sufficient." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (quotation omitted). A complaint must plead claims that are facially plausible—

---

[21] CDC, *HIV Risk Among Persons Who Exchange Sex for Money or Nonmonetary Items*, http://tinyurl.com/yh7mfwkm (last visited Mar. 25, 2024).

*i.e.*, supported by "factual content that allows the court to draw the reasonable inference that the defendant is liable." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The mere "possibility that a defendant has acted unlawfully" is insufficient. *Id.*

**ARGUMENT**

I.    **Title II of the ADA Does Not Authorize the Federal Government to Initiate Enforcement Actions.**

Congress did not authorize the Attorney General to sue States under Title II. The federal government identifies no textual authorization in Title II for federal enforcement actions. While Titles I and III expressly authorize suit both by "the Attorney General" and by a "person alleging discrimination," Title II only authorizes suit by a "person alleging discrimination," 42 U.S.C. §§ 12117(a), 12133, 12188—which the Attorney General is not, and does not claim to be. This should be the end of the matter.

This omission is particularly significant given the federalism considerations that Title II implicates. Allowing a federal agency to superintend States' public "services, programs, or activities," *id.* § 12132, and dictate a State's criminal laws would alter the usual constitutional balance between the States and the federal government. And before such a rebalance may occur, Congress "must make its intention … unmistakably clear." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (internal marks omitted). Nothing in Title II of the ADA provides an "unmistakably clear" signal that Congress authorized DOJ to sue States under Title II.

A.    **The plain text of Title II does not provide a cause of action to the federal government.**

Congress alone authorizes the class of individuals who can sue under the laws it enacts. *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 885 (9th Cir. 2005). "Any and all authority pursuant to which an agency may act ultimately must be grounded in an express grant from Congress." *Killip v. Office of Pers. Mgmt.*, 991 F.2d 1564, 1569 (Fed. Cir. 1993); *see Oceanair of Fla., Inc. v. U.S. Dep't of Transp.*, 876 F.2d 1560, 1565 (11th Cir. 1989). Congress stated very

7

clearly who could enforce Title II: "any *person* alleging discrimination on the basis of disability in violation of" Title II.  42 U.S.C. § 12133 (emphasis added).

The "federal government" is not a "person." *See Return Mail, Inc. v. U.S. Postal Serv*., 139 S. Ct. 1853, 1861-62 (2019).  Indeed, there is a "longstanding interpretive presumption that 'person' does not include the sovereign." *Id.*; *see also Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 780 (2000). In other words, "person" means what it says: individuals.[22] No ordinary speaker of English would think a statute "provid[ing]" a remedy only to "person[s] alleging discrimination" also covers the federal government.

And basic interpretive principles support that "longstanding interpretative presumption" here. *Return Mail*, 139 S. Ct. at 1861-62.  For one, "Congress . . . does not ... hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).  This suit by the United States against a State on behalf of any number of unspecified "aggrieved individuals" is nothing if not elephantine.  For two, Congress knows how to give the Attorney General a cause of action, and when it does so, it is *explicit*.  *See, e.g.*, 52 U.S.C. § 10701(a)(1) (directing "[t]he Attorney General … to institute" actions to enforce the Twenty-Sixth amendment); 52 U.S.C. § 10101(c) (authorizing "the Attorney General" to enforce the Voting Rights Act); 18 U.S.C. § 248(c) (authorizing "the Attorney General" to enforce the Freedom of Access to Clinic Entrances Act).

Put simply, Title II authorizes "person[s]" to enforce Title II, and the federal government is not a person.  In answering whether the federal government has a cause of action, the word

---

[22] The federal government's own regulations, which it points to as its "authority" to bring this lawsuit, demonstrate that Title II, properly understood, does not give the federal government a cause of action.  (DKT. 1, ¶ 6.)  Nowhere do the regulations contemplate a lawsuit being brought by the federal government; they say only that agencies might issue "Letters of Findings." 28 C.F.R. § 35.172(c).  In fact, the regulations are clear that "[a]t any time, the *complainant* may file a private suit." *Id*. at § 35.172(d) (emphasis added).  Regardless, authority to bring enforcement actions must be found in a statute - not regulations. *Smith v. Dearborn Fin. Servs., Inc.*, 982 F.2d 976, 979 (6th Cir. 1993) (explaining that "federal regulations cannot themselves create a cause of action").

"person" is "precisely where this case should begin and end." *United States v. Fla*., 938 F.3d 1221, 1253 (11th Cir. 2019) (Branch, J., dissenting).

**B.**     **The structure of the ADA confirms that the federal government lacks a cause of action under Title II.**

Reading "person" to mean individuals also gives full effect to the ADA's entire scheme.

Congress carefully created specific enforcement regimes in the ADA—explicitly giving the "Attorney General" authority to bring actions in Titles I and III, but not in Title II. 42 U.S.C. §§ 12117(a), 12188.  Title I's enforcement provision expressly names the "Attorney General" alongside "any person alleging discrimination." *Id*. Title III's enforcement provision, which addresses discrimination in public accommodations, is structured a bit differently, but it too vests the Attorney General with authority to sue. *Id*. § 12188(b)(1)(B) ("the Attorney General may commence a civil action..."). Title II, by contrast, mentions "any person alleging discrimination," but not the "Attorney General." *Id*. § 12133.  This distinction matters.[23]

Under the canon of *expressio unius est exclusio alterius*, a law that expressly provides rights to A does not provide rights to A and B.  "The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001); *see Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979) ("[W]here a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it.").  Because Congress provided only "person[s] alleging discrimination" the

---

[23] The Supreme Court has not overlooked the distinction between the enforcement provisions of the three titles. In *Olmstead v. Zimring,* Court observed that the plain texts of Titles I and III are different than Title II, in that individuals can enforce Title II, while individuals *and* the Attorney General can enforce Titles I and III. 527 U.S. 581, 591 n. 5 (1999); *accord Newport News*, 514 U.S. at 129 ("[W]hen an agency in its governmental capacity is meant to have standing, Congress says so.").  And in at least four other instances, the Supreme Court has addressed the private right of action under Title II without so much as hinting that there might exist a federal enforcement action. *See Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 750 (2017); *United States v. Georgia*, 546 U.S. 151, 154 (2006); *Tennessee v. Lane*, 541 U.S. 509, 517 (2004); *Barnes v. Gorman*, 536 U.S. 181, 184–85 (2002).

"remedies, procedures, and rights" provided in Title VI, 42 U.S.C. § 12133, it meant to preclude the federal government from independently bringing Title II claims.  A statute—like the ADA—that "carefully enumerates the parties entitled to seek relief" cannot be read to confer rights on unnamed parties.  *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 27 (1983).

The differences between Title II and Titles I and III lead to a particularly strong inference in this case, as all three provisions are located *within the same act*.  When "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *Russello v. United States*, 464 U.S. 16, 23 (1983).  Applying that principle here: Because Congress conferred a cause of action on the "Attorney General" in two sections of a statutory scheme, but not in another, its silence cannot imply the existence of a separate cause of action. *E.g., Marshall v. Gibson's Prod., Inc. of Plano*, 584 F.2d 668, 672–676 (5th Cir.1978); *see In re Griffith*, 206 F.3d 1389, 1394 (11th Cir. 2000) (en banc) ("where Congress knows how to say something but chooses not to, its silence is controlling").

Nor can the federal government dodge these structural implications by contorting the meaning of "person."  If the Attorney General were a "person," then the express inclusion of the "Attorney General" in Titles I and III would be entirely unnecessary, contradicting the "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant." *Kungys v. United States*, 485 U.S. 759, 778 (1988).  And the term "person" cannot be read to include the Attorney General in Title II but not Title I or III.   That would depart from the general principle that identical words used in different parts of the same act are intended to have the same meaning. *See, E.g., Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980) (refusing to give "the word 'filed' two different meanings in the same section of the statute ....").  Not only that, it would run

headlong into the "longstanding interpretive presumption that 'person' does not include the sovereign." *Vt. Agency,* 529 U.S. at 780; *see Return Mail*, 139 S. Ct. at 1861-62.

At bottom, to establish that "the Attorney General" is a "person" within the meaning of Title II, DOJ has to convince this Court either (1) that Congress used the word "person" with different meanings in Titles I and III than in Title II or (2) that the use of "Attorney General" in addition to and alongside the word "person" is redundant. And it would then need to overcome the "longstanding interpretive presumption that 'person' does not include the sovereign." *Vt. Agency,* 529 U.S. at 780; *see Return Mail*, 139 S. Ct. at 1861-62. It cannot do so.

### C.    Allowing the federal government to enforce Title II would upset the balance of federalism.

Principles of federalism provide an additional basis for rejecting the federal government's claimed authority. Title II—which prohibits discrimination in access to public "services, programs, and activities," 42 U.S.C § 12132—implicates States' sovereign interests in ways Title I (employment) and Title III (public accommodation) do not. When Congress legislates in an area of traditional state concern or intends to alter the constitutional balance between the state and federal governments, courts require Congress to make a "clear statement" to that effect in the statute. *See Gregory*, 501 U.S. at 461 ("This plain statement rule is nothing more than an acknowledgment that the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere."). But Title II lacks any statement, let alone a clear one, that Congress intended to allow DOJ to wrest control of a sovereign State's criminal code.

As a policy matter, Congress's decision to draw the line at individual enforcement is eminently reasonable given the distinct federalism implications associated with Title II. After all, Title I prohibits discrimination in employment and ordinarily applies to private employers. Title III regulates public accommodations provided by private entities. Title II, however, regulates the

entire spectrum of public services and programs that state governments have administered without federal supervision for two centuries. Even Title II suits brought by individuals carry "federalism costs inherent in referring state decisions regarding the administration of treatment programs and the allocation of resources to the reviewing authority of the federal courts." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 610 (1999) (Kennedy, J., concurring); *id.* at 624 (Thomas, J., dissenting) ("the Majority's approach imposes significant federalism costs, directing States how to make decisions about the delivery of public services."). Vesting DOJ with discretion to bring claims for systemic relief would thus work a "significant change in the sensitive relation between" the federal government and the States. *United States v. Bass*, 404 U.S. 336, 349 (1971). "Title II enforcement could bring the federal and state governments into broad-scale conflict in a way that suits under Title I and III would not." *United States v. Sec'y Fla. Agency for Health Care Admin.*, 21 F.4th 730, 751 (11th Cir. 2021) (Newsom, J., dissenting from denial of rehearing en banc).

If Congress intended Title II to allow federal encroachment on a traditional state prerogative, it was required to do so with far more clarity than it did in Title II. The Supreme Court has long presumed that Congress legislates with an eye toward "preserv[ing] the constitutional balance between the National Government and the States." *Bond v. United States*, 572 U.S. 844, 862 (2014) (quotations omitted). This Court routinely invokes a federalism-based interpretive principle when construing acts of Congress.[24] To displace traditional spheres of state authority, Congress must make its intention "clear and manifest" if it intends to preempt the historic powers of the States, such as enacting and enforcing its own criminal laws. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

---

[24] *See U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1849–50 (2020); *Bond*, 572 U.S. at 857–860; *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001); *Jones v. United States*, 529 U.S. 848, 858 (2000); *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 544 (1994); *United States v. Bass*, 404 U.S. 336, 349–50 (1971); *United Auto., Aircraft & Agric. Implement Workers of Am. v. Wisc. Emp. Rels. Bd.*, 351 U.S. 266, 274–75 (1956); *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 513 (1940).

In *Gregory v. Ashcroft*, for example, the Supreme Court concluded that the Age Discrimination in Employment Act ("ADEA") did not prohibit Missouri's mandatory retirement age for state judges.  501 U.S. 452, 458 (1991). Allowing the federal government to intrude upon such a traditional domain of state administration, the Court explained, would have "upset the usual constitutional balance of federal and state powers," *id*. at 460.  The Court reasoned that just as the federal separation of powers promotes individual liberty, the Constitution's "healthy balance of power between the States and the Federal Government" helps "reduce the risk of tyranny and abuse from either front." *Gregory*, 501 U.S. 452, 458 (1991).  Congress must speak plainly: "it must make its intention to [alter the usual constitutional balance] unmistakably clear in the language of the statute." *Id*. (internal marks omitted).  And courts must be "certain of Congress' intent before finding that federal law overrides this balance." *Id*. (internal marks omitted).

It is not enough to say that Title II applies to the States.  Tennessee does not dispute that Title II applies to certain state-run programs or that "any person alleging discrimination" may sue.  But just because Title II's substantive requirements apply to the States does not mean Congress gave the federal government the right to sue. *Sandoval*, 532 U.S. at 288-89.  The question is also not whether Congress *can* authorize suit by the federal government—but whether it *has* done so with Title II.  That is a different and critical distinction, particularly when, as here, the federal government is suing a sovereign State.

Not only does the federal government ask this Court to unearth a cause of action for it in Title II.  It also asserts that with this invisible cause of action, Congress intended the federal government to be able to force the States to pay money damages to whoever the federal government chooses to sue "on behalf of." (*See* DKT. 1, at Prayer for Relief (F).)  That cannot be squared with federalism. The Supreme Court already decided that private litigants cannot recover money damages from the States under Title I, *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356 (2001), and only in certain circumstances can they recover under Title II, such as for

13

"conduct that *actually* violates the Fourteenth Amendment," an allegation not made in this case. *United States v. Georgia*, 546 U.S. 151, 159 (2006) (emphasis in original). Here, the federal government attempts to intercede to accomplish what a private individual could not: obtain money damages from the State.  Indeed, the private litigants suing about the same statute chose *not* to seek compensatory damages. (*See generally* DKT. 62, Prayer for Relief.)   The federal government cannot fashion itself a sovereign-immunity-Trojan-horse able to raid the State coffers on behalf of private individuals who could not have done so on their own.  This brazen and subversive use of Title II the federal government presses here underscores the degree to which their weaponized use of Title II runs afoul of basic federalism.

> **D.    This court should not follow *United States v. Florida*.**

A divided panel of the Eleventh Circuit wrongly concluded in *United States v. Florida* that the federal government has a cause of action under Title II.  According to the majority, the Attorney General may sue under Title II because the "remedies, procedures, and rights" language of the relevant text "adopt[ed] federal statutes" that contemplate enforcement and suit by the Attorney General. *Florida*, 938 F.3d at 1227-29.   Rather than rely on the plain language of the relevant provision, the majority spent dozens of pages untangling the alleged "cascade" created by Title II's cross reference to Title VI of the Civil Rights Act.  *Id.*  This exact type of strenuous judicial effort skirts not only the plain language of Title II, *supra* II(a), but also the well-established requirement that Congress must make an "unmistakably clear" statement in order to give the federal government a cause of action against the States. *Blatchford v. Native Vill. of Noatak & Circle Vill.*, 501 U.S. 775, 786 (1991).

The Eleventh Circuit's decision was far from well-established law.  The Fifth Circuit has recognized that *Florida* addressed a "difficult issue." *See United States v. Mississippi*, 82 F.4th 387, 391 n.6 (5th Cir. 2023).  Indeed, the panel decision drew a full-throated dissent from Judge Branch.  *See Florida*, 938 F.3d at 1250-54.  And other judges criticized the full court's failure to

rehear the matter en banc.  *See FAHCA*, 21 F.4th at 747–59 (Newsome, J., dissenting from denial

of rehearing en banc). Ultimately, the *Florida* majority was wrong in four ways.

      1.     The majority ignored the "longstanding interpretive presumption that 'person' does

not include the sovereign." *Return Mail*, 139 S. Ct. at 1861-62.  As explained, the Attorney General

is not included within the term "person" under Titles I and III. *Supra* (II)(a); *see, e.g.*, *Republic of*

*Sudan v. Harrison*, 139 S. Ct. 1048, 1058 (2019) (explaining that courts should be "hesitant to

adopt an interpretation of a congressional enactment which renders superfluous another portion of

that same law" (quotation omitted)).  This commonsense conclusion that the federal government

is not a "person," combined with the "more than 100 years of Supreme Court precedent" saying

as much, should not be "so easily shrugged off." *FAHCA*, 21 F.4th at 751 (Newsom, J., dissenting).

Even the judges that declined to revisit the panel decision were forced to offer a euphemistic spin

on the panel's error. *Id*. at 747 (J. Pryor, J., respecting the denial of rehearing en banc) ("[T]he

panel correctly held that the Attorney General was authorized in this case to sue the State of

Florida, *on behalf of* the medically-fragile children, for disability discrimination.").

      2.     The *Florida* majority was just as wrong to conclude that the Attorney General has

standing to sue on behalf of *other* "person[s] alleging discrimination."  Title II's incorporation of

remedies from Title VI of the Civil Rights Act and the Rehabilitation Act affords two methods by

which a plaintiff can seek to "effect[ ]" compliance with Title II: (1) "termination" (or refusal) of

federal funding; and (2) "any other means authorized by law." 42 U.S.C. § 2000d–1.  But Title VI

and the Rehabilitation Act are Spending Clause statutes, while the ADA is not. At best, these

limited remedies support the narrow proposition that the federal government can sue *federal-*

*funding recipients for breach of contract*.  There simply is no cause of action authorizing the

government's non-contract suit here, and a court cannot conjure one, no matter how sympathetic

the plaintiffs' case. *See, e.g., Sandoval*, 532 U.S. at 286–87 (explaining that without clear evidence

of congressional intent, "a cause of action does not exist and courts may not create one, no matter

how desirable that might be as a policy matter, or how compatible with the statute"). Unless the government is suing to enforce limits on federal funding, Title II directs courts to look *elsewhere* for a cause of action that is "authorized by law." The federal government cannot point to a valid source of law that gives it a cause of action to sue for violating Title II and has not tried to do so here.

3. The majority also turned to general policy considerations to find a cause of action, *Florida*, 938 F.3d at 1243 ("examin[ing] the nature, structure, and purpose of the relevant statutory scheme"), flouting the settled principle that federal agencies do not "automatically have standing to sue for actions that frustrate the purposes of their statutes." *Newport News*, 514 U.S. at 132. "[W]hen an agency in its governmental capacity is meant to have standing, Congress says so." *Newport News*, 514 U.S. at 129. The question is not whether Congress may give the federal government a cause of action, but whether it *has*. Congress has not done so in Title II. *Supra* (II)(A). This Court should decline to follow the Eleventh Circuit's flawed approach of digging through the "cascade of cross-references," *Florida*, 938 F.3d at 1229, to allow an intrusion of on dual sovereignty absent a clear statement from Congress. *Kimel*, 528 U.S. at 73. Just because "States do not retain sovereign immunity from suits brought by the federal government," *Florida*, 938 F.3d at 1250, does not mean the federal government has a cause of action. In fact, it means the opposite. The absence of state sovereign immunity from suits brought by the federal government is one reason why Congress must be clear when it creates a cause of action for the federal government.

4. The majority treated federalism like an afterthought. It brushed federalism aside based on circular logic: "[b]ecause Congress did in fact authorize the Attorney General to sue any public entity for discrimination in violation of Title II, there is no federalism problem here." *FAHCA*, 21 F.4th at 734 (Pryor, J., respecting the denial en banc). But that gets it backwards. Federalism principles should have been *part* of the Court's examination of whether the Attorney

General has a cause of action under Title II.   Wielding federal power against the states should not be casually inferred, especially when the textual basis is fraught. *See Gregory*, 501 U.S. at 460 (stating that the ability of Congress to "legislate in areas traditionally regulated by the States ... is an extraordinary power in a federalist system ... that we must assume Congress does not exercise lightly"); *id*. at 464 ("[T]o give the state-displacing weight of federal law to mere congressional ambiguity would evade the very procedure for lawmaking on which Garcia relied to protect states' interests." (quoting Laurence H. Tribe, American Constitutional Law § 6–25, at 480 (2d ed. 1988))).

The *Florida* decision permitted federal encroachment on a State's sovereign prerogatives—in the absence of any textual evidence that Congress intended such a result. "[F]ederal legislation threatening to trench on the States' arrangements for conducting their own governments should be treated with great skepticism, and read in a way that preserves a State's chosen disposition of its own power…" *Nixon v. Missouri Mun. League*, 541 U.S. 125, 140 (2004). By ignoring this core tenet, the panel conducted, at best, an incomplete analysis that focused solely on whether Congress *could* regulate States in this regard if it wanted to.   But the presumption that Congress would not do so lightly—and certainly not impliedly—is utterly lacking from the panel's analysis.

## II.      The Complaint Fails to State a Claim under Title II.

Setting aside *whether* DOJ has any cause of action under Title II, this Court must consider *what* cause of action Title II provides.   The federal government claims the authority to wipe off the books Tennessee statutes that have protected the public from the spread of deadly disease for decades.   But Congress did not write a statute that broad.   The novel legal theory asserted attempts to invade Tennessee's longstanding "power to regulate the public health [that] has been 'part and parcel' of states' 'traditional police power.'"   *Kentucky v. Biden*, 23 F.4th at 609.   Title II has nothing to do with States' administration of their criminal codes.   Instead, its text, structure, and

history show that Title II is concerned only with guaranteeing equal access to benefits States extend through their programs, services, and activities. The federal government's claims fall well outside of Title II's scope.

The proper "starting point" is the text of Title II. *Thompson v. Greenwood*, 507 F.3d 416, 419 (6th Cir. 2007). That provision specifies that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II's text thus focuses on public entities affirmatively providing equal access to the benefits of their public services, programs, and activities. *Elwell v. Oklahoma ex rel Bd. of Regents of University of Oklahoma*, 693 F.3d 1303, 1306 (10th Cir. 2012) ("'Services' are ordinarily understood as acts done for the benefit of another . . . Much the same might be said of the term 'program.'") (internal citations and quotations omitted); *Zimmerman v. Oregon Dept. of Justice*, 170 F.3d 1169, 1174 (9th Cir. 1999) (holding that the text of Title II "presuppose[s] that the public entity provides an output that is generally available, and that an individual seeks to participate in or receive the benefit of such an output"). And, as then-Judge Gorsuch explained, inclusion of "activities" does "not necessarily rope in everything [a public] entity does." *Elwell*, 693 F.3d at 1307. Read with the commonsense canon of *noscitur a sociis*, *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 634-35 (2012) ("[A] word is given more precise content by the neighboring words with which it is associated."), "activities" captures "the outputs the public entity provides to the public it serves." *Elwell*, 693 F.3d at 1307. In short, if a plaintiff "has not identified a service, program, or activity of a public entity . . . that she seeks to access," there is no Title II claim. *Babcock v. Michigan*, 812 F.3d 531, 538 (6th Cir. 2016).

Title II's residual clause—prohibiting "discrimination by any [public] entity"—does not alter the focus of the plain text; it adheres to it. *See Zimmerman*, 170 F.3d at 1175. The residual clause "does not exist in isolation and cannot be read as if it did." *Brumfield v. City of Chicago*,

735 F.3d 619, 627 (7th Cir. 2013); *Zimmerman*, 170 F.3d at 1175 (reading the residual clause as "relat[ing] back to the same 'services, programs, or activities'").  Read in context, Title II's residual clause, "like the first, prohibits discrimination only in a public entity's 'outputs.'" *Zimmerman*, 170 F.3d at 1176.  But while the preceding clause prohibits public entities from absolutely excluding qualified individuals from programs and services, the residual clause "prohibit[s] *intentional* discrimination" within those programs.  *Id.*; *Behar v. Pa.. Dept. of Transp.*, 791 F. Supp. 2d 383, 399 (M.D. Pa. 2011).  That reading of the residual clause is consistent with the *ejusdem generis* canon because it "give[s] independent effect" to the preceding terms and construes "the general words" of the residual clause "to embrace only objects similar in nature to those" in the preceding clause.  *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001); *see CSX Transp., Inc. v. Alabama Dept. of Revenue*, 562 U.S. 277, 295 (2011).  The federal government's contrary, broader reading would cause the residual clause to swallow the rest of Title II—violating the general rule that "no clause, sentence, or word of a statute should be read as superfluous, void, or insignificant."  *In re City of Detroit*, 841 F.3d 684, 696–97 (6th Cir. 2016) (internal quotation marks and citation omitted).

Title II's structure reinforces this reading.  *United States v. Choice*, 201 F.3d 837, 840 (6th Cir. 2000) (explaining that the design of the statute as a whole can help interpret the plain meaning of statutory language).  Title II covers only "qualified individual[s]."  42 U.S.C. § 12132.  The definition of "qualified individual" in turn requires showing that a plaintiff meets "the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2).  The only "sensible way" to read the residual clause's prohibition on any "qualified individual . . . [being] subjected to discrimination" is to "carefully follow" the definition of qualified individual.  *Brumfield*, 735 F.3d at 628; Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* at 225 (Thomson/West 2012) ("[I]nterpretation clauses are to be carefully followed.").  Read together, the residual clause

of Title II protects "an individual with a disability who . . . meets the essentially eligibility requirements *for the receipt of services or the participation in programs or activities provided by a public entity*," 42 U.S.C. § 12131(2), from being "subjected to discrimination," 42 U.S.C. § 12132, in the receipt of those services or participation in those programs or activities. *Brumfield*, 735 F.3d at 628 (holding the residual clause "is properly read to cover" a public entity's "delivery of public services, programs, and activities to eligible recipients"); *Elwell*, 693 F.3d at 1308 ("If we read *both* clauses of § 12132 as referring to the agency's services, programs, and activities, then the definition of "qualified individual" in § 12131(2) makes sense.").

That commonsense reading of the residual clause does not give DOJ a license to go hunting for state activity it dislikes.  Reading the residual clause to do anything more than prevent discrimination within the "outputs" offered by public entities makes the whole statutory framework nonsensical by offering a remedy regardless of whether the disabled individual is otherwise eligible for participation in some public program, service, or activity.  *See Guzman v. United States Dept. of Homeland Security*, 679 F.3d 425, 432 (6th Cir. 2012) ("Interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.").

The "title of" Title II—"Public Services," Pub. L. No. 101-336, § 1—is yet another "cue[]" that Congress did not intend" Title II to "sweep within its reach" the federal government's novel claim. *Yates v. United States*, 574 U.S. 528, 540 (2015).  The title of Title II directly correlates to its "focus[] on discrimination in public services, programs, and activities." *Elwell*, 693 F.3d at 1309.  "Congress's decision to separate the ADA into distinct titles covering different kinds of discrimination" indicates the limitations of the prohibitions in each title. *Mary Jo C. v. New York State and Loc. Ret. System*, 707 F.3d 144, 169 (2d Cir. 2013).

Title II's history is likewise telling.  While legislative history cannot override unambiguous text, historical sources can convey a law's ordinary meaning at the time of enactment. *Bostock v.*

20

*Clayton County, Georgia*, 590 U.S. 644, 674-75 (2020).  And Congress invoked Section 5 of the Fourteenth Amendment in enacting the ADA—making its consideration of a record of past discrimination highly relevant to the scope of future discrimination Congress intended to prohibit. *See City of Boerne v. Flores*, 521 U.S. 507, 532 (1997).  "Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state *services and programs*, including systemic deprivations of fundamental rights." *Lane*, 541 U.S. at 524 (emphasis added). Absent from this historical record is discrimination based on individuals' knowingly engaging in unlawful conduct that risks transmitting deadly diseases to others.

This Court should reject reading Title II's residual clause to make a hash of myriad other ADA provisions.  Instead, it should "giv[e] effect to each word" by reading the residual clause's plain text not to "render[] other provisions of the [ADA] inconsistent."  *Menuskin v. Williams*, 145 F.3d 755, 768 (6th Cir. 1998).  Under that view, Title II's residual clause "prohibit[s] *intentional* discrimination" against disabled persons in the provision of benefits to the public, whereas the first clause "prohibit[s] *disparate treatment* of the disabled"—regardless of whether such treatment reflects discriminatory intent. *Zimmerman*, 170 F.3d at 1176 (emphasis in original). That reading gives full independent effect to each term in Title II and makes sense of Title II's definitional sections.  It also corresponds to the elements courts regularly use to analyze ADA claims: (1) "disability," (2) "denial of public benefit," and (3) "that such denial or discrimination was by reason of the disability." *See Thompson v. Williamson County, Tenn.*, 965 F. Supp. 1026, 1036 (M.D. Tenn. 1997); *Kornblau v. Dade County*, 86 F.3d 193, 194 (11th Cir. 1996); *see Green v. Corrections Corp. of Am.*, 198 F.3d 245 (Table), 1999 WL 1045087, at *1 (6th Cir. 1999).

With that reading of the ADA, the federal government's asserted claim fails.  The complaint does not allege that any person has been denied *any* public service or benefit for which they were otherwise eligible because of their disability.  Instead, it argues that Congress intended Title II to generally invalidate all state laws that "do[] not provide equal treatment," including laws

21

regulating the knowing exposure of deadly communicable diseases.  (*See* DKT. 1, ¶ 73.)  Title II is simply not that broad and is, instead, "subject… to the bounds of reasonableness."  *Tri-Cities Holdings, LLC v. Tenn. Admin. Procedures Div*., 726 F. App'x 298, 308 (6th Cir. 2018).  Alleging that the State imposes greater punishment for aggravated prostitution than for simple prostitution does not allege conduct that violates Title II.

The bottom line:  Because the federal government has not alleged that individuals with disabilities are denied public benefits that they otherwise qualify for, it has failed to state a claim under Title II.  42 U.S.C. §§ 12131(2), 12132.

## III.    The Federal Government Failed to Sue a Proper Defendant.

Even if DOJ had authority to enforce Title II and a cognizable theory, it lacks standing.  As a plaintiff seeking to sue a sovereign entity or its agents in federal court, the federal government must satisfy the minimum requirements of Article III.  *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) ("Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff that who would not otherwise have standing." (citation omitted)).  "To establish Article III standing, an injury must be "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  DOJ seeks to advance a Title II claim, not based on its own injury, but on behalf of Complainant A and similarly situated individuals who have been convicted of aggravated prostitution.  (DKT. 1, ¶ 11.)

But even if those convictions and the associated registration requirements qualify as injury, none is traceable to actions by the defendants here.  Neither "the State" nor TBI enforce the aggravated prostitution statute.  Power to enforce the criminal laws resides exclusively with local district attorneys general.  Tenn. Code Ann. § 8-7-103(1).  District courts have recognized this consistently and recently. *See, e.g., Ashe v. Hargett*, No. 3:23-CV-01256, 2024 WL 923771, at *7 (M.D. Tenn. Mar. 4, 2024).  Because Article III's "traceab[ility]" prong requires the federal

government to prove that the alleged harm "can be traced to [the] 'allegedly unlawful conduct of'" each defendant, it has standing to challenge TN-SORA only to the extent that it alleges harms from the aspects of the TN-SORA that TBI oversees. *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021). TBI does not enforce the TN-SORA's reporting requirements or "exclusion zones" at the core of the federal government's registry claims. *See Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1032 (6th Cir. 2022) (citing Tenn. Code Ann. § 8-7-103(1)).

For similar reasons, an injunction against the State or TBI would not redress any injury alleged here. The Court can only "enjoin individuals tasked with enforcing laws, not the laws themselves." *Whole Woman's Health v. Jackson*, 141 S. Ct. 2494, 2495 (2021). And courts may not grant an injunction "so broad as to make punishable the conduct of persons who act independently and whose rights have not been adjudged according to law." *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 13 (1945); *see also Scott v. Donald*, 165 U.S. 107, 117 (1897) ("The decree is also objectionable because it enjoins persons not parties to the suit.").

Rooted in Article III standing, a court issuing an injunction must look to a "defendant's actual action," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)—not individuals who "were not parties to the suit" and who may or may not be bound by a judgment. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 568 (1992). "A court order that goes beyond the injuries of a particular plaintiff to enjoin government action against nonparties exceeds the norms of judicial power." *L. W. by and through Williams v. Skrmetti*, 83 F.4th 460, 490 (6th Cir. 2023) (citation omitted). That a third party might be affected by "an incidental legal determination" is not dispositive because the judgment is not "binding upon" them. *Lujan*, 504 U.S. at 569.

Ultimately, the federal government must "satisfy[] the traceability and redressability requirements of standing against a defendant," not "nonparties 'who are in active concert' with a defendant." *Jacobson v. Florida Sec'y of State*, 974 F.3d 1236, 1255 (11th Cir. 2020) (quoting Fed. R. Civ. P. 65(d)(2)(C)). But it cannot do so here based merely on the "presence of a

disagreement," over the legality of the challenged laws—"however sharp and acrimonious it may be." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013).

## IV.    The Requested Remedy Is Improper.

The federal government seeks sweeping declaratory and injunctive relief that is untethered to its claims and beyond this Court's jurisdiction. It requests a declaration and injunction that would (1) bar all enforcement of the aggravated prostitution statute and administration of the sex offender registry requirements against those convicted, and (2) affirmatively require unknown individuals to remove individuals from the registry, expunge all their criminal records, and order Tennessee to pay compensatory damages to them.  *See* Prayer for Relief (A)-(F).

The Court cannot entertain a request to enjoin "the State" because the federal government could not identify the correct state officers, officials, and employees who had to be enjoined to comply with this Order.  The federal government's requested relief requires the court to buy into the fallacy that "the State of Tennessee" is the individual who enforces and administers its laws. Whatever significance this notion might have in the abstract falls apart when discussing injunctive relief.  Again, "federal courts enjoy the power to enjoin *individuals* tasked with enforcing laws not the laws themselves." *Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021) (emphasis added). Nor can the Court "erase" statutes from the books. *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring) (quoting Jonathan Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 1016-17 (2018)).  And an "injunction is a judicial process or mandate" that "operat[es] *in personam*." *Nken*, 556 U.S. at 428.  It therefore must "direct [] the conduct of a particular actor." *Id.*; *see also California v. Texas*, 593 U.S. 659, 671 (2021).  And any relief entered should at most govern the plaintiffs' rights, not enjoin the law for all individuals statewide.  *L.W.*, 83 F.4th at 490 (finding too broad injunction that blocked enforcement "against the nine challengers and against the other seven million residents").

The federal government should not be allowed to feign ignorance regarding who to sue to obtain an anti-enforcement injunction in Tennessee.  Power to enforce the criminal laws resides exclusively with local district attorneys general.  Tenn. Code Ann. § 8-7-103(1).  District courts have recognized this consistently and recently. *See, E.g., Ashe v. Hargett*, No. 3:23-CV-01256, 2024 WL 923771, at *7 (M.D. Tenn. Mar. 4, 2024).  Because the federal government has failed to give the Court sufficient information to enable it to "state its terms specifically; and ... describe in reasonable detail ... the act or acts restrained or required," Fed. R. Civ. P. 65(d), the Court cannot entertain the federal government's request for a sweeping anti-enforcement injunction. (DKT. 1, Prayer for Relief at (B) – (E).)

The court cannot avoid that result by giving the federal government what it wants and leaving it to "the State" to figure out what is required to avoid contempt.  Courts may not grant an injunction "so broad as to make punishable the conduct of persons who act independently and whose rights have not been adjudged according to law." *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 13 (1945); *see also Scott v. Donald*, 165 U.S. 107, 117 (1897) ("The decree is also objectionable because it enjoins persons not parties to the suit.").  Moreover, the federal government's request for money damages is inappropriate for the reasons explained *supra* (I)(C).

## CONCLUSION

For these reasons, the Complaint should be dismissed in its entirety.

Respectfully submitted,

JONATHAN SKRMETTI
Attorney General and Reporter

*/s/ John R. Glover*
JOHN R. GLOVER (BPR # 037772)
Assistant Attorney General

CODY N. BRANDON (BPR# 037504)
Managing Attorney
Senior Assistant Attorney General

DAVID RUDOLPH (BPR# 13402)
Senior Assistant Attorney General

Law Enforcement &
Special Prosecutions Division
Office of the Tennessee
Attorney General & Reporter
PO Box 20207
Nashville, TN  37202
Off. (615) 532-2552
Fax (615) 532-4892
John.Glover@ag.tn.gov
Cody.Brandon@ag.tn.gov
David.Rudolph@ag.tn.gov

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing was filed and served via the Court's electronic filing system on this the 10th day of April 2024, upon:

Stella Yarbrough (BPR No. 033637)
Jeff Preptit (BPR No. 038451)
Lucas Cameron-Vaughn (BPR No. 036284)
ACLU FOUNDATION OF TENNESSEE
P.O. Box 120160
Nashville, TN 37212
Phone: (615) 320-7142
SYarbrough@aclu-tn.rog
JPreptit@aclu-tn.org
Lucas@aclu-tn.org

Alex Agathocleous (NY Bar 4227062)
Alexis Alvarez (NY Bar 5854278)
Jon W. Davidson (CA Bar 89301)
Rachel Meeropol (NY Bar 4100954)
AMERICAN CIVIL LIBERTIES UNION
125 Broad St., New York, NY 10004
Phone: (929) 585-0061
AAgathocleous@aclu.org
AlexisA@aclus.org
JonDavidson@aclu.org
RMeeropol@aclu.org

Lynly S. Egyes (NY Bar 4838025)
Milo Inglehart (NY Bar 5817937)
TRANSGENDER LAW CENTER
594 Dean Street, Suite 11
Brooklyn, NY 11238
Phone: 510 587-9898 Ext. 353
Lynly@transgenderlawcenter.org
Milo@transgenderlawcenter.org

Dale Melchert (NY Bar 5366554)
TRANSGENDER LAW CENTER
P.O. Box 70976
Oakland, CA 94612
Phone: (510) 587-9696 Ext. 354
Dale@transgenderlawcenter.org
*Counsel for Plaintiffs*

Stephanie Berger

Ali Szemanski
U.S. Department of Justice
150 M Street NE
Washington, DC 20002
*Counsel for the United States*

s/ *John R. Glover*
JOHN R. GLOVER