IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| **OUTMEMPHIS; MICHELLE ANDERSON; JANE DOE 2; JANE DOE 3; and JANE DOE 4,** ) ) ) ) | |
| Plaintiffs, ) | |
| v. ) ) | |
| **BILL LEE, in his official capacity as Governor of Tennessee; JONATHAN SKRMETTI, in his official capacity as Attorney General and Reporter of Tennessee; DAVID RAUSCH, in his official capacity as Director of the Tennessee Bureau of Investigation; and FRANK STRADA, in his offical capacity as Commissioner of the Tennessee Department of Correction,** ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. ) | |
| ------------------------------------------------------- ) | Case Nos.   2:23-cv-2670 |
| **UNITED STATES OF AMERICA,** ) ) | 2:24-cv-02101 |
| Plaintiff, ) | **Chief Judge Lipman** |
| ) | |
| v. ) ) | |
| **STATE OF TENNESSEE, and TENNESSEE BUREAU OF INVESTIGATION,** ) ) ) ) | |
| Defendants. ) | |

**REPLY IN SUPPORT OF STATE OFFICIALS'**[1]
**MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

---

[1] State Officials include defendants Governor Lee, Attorney General Skrmetti, TBI Director Rausch, and TDOC Commissioner Strada.

# INTRODUCTION

This lawsuit should not continue to a futile discovery process. Basic standing and sovereign immunity principles require dismissal of several claims and defendants. (Dkt. 66-1, at 22-33.) [2] And, for the parties left, the asserted claims fail to state cognizable theories. (Dkt. 66-1, at 33-63.) Plaintiffs have not alleged—and cannot allege—a violation of the Americans with Disabilities Act (ADA). (Dkt. 66-1, at 33-47)   Nor do their scattershot constitutional theories state a claim. (Dkt. 66-1, at 54-62.). Plaintiffs' Response only illuminates the many, compounding flaws in the asserted claims. The Court should grant the motion to dismiss.

## I. Sovereign Immunity and Standing Require Dismissal of Governor Lee and General Skrmetti. (State Officials' Memorandum Parts I(A) and II(B))

Neither Governor Lee nor General Skrmetti enforce the challenged statutes. Both sovereign immunity and standing require their dismissal as defendants. (Dkt. 66-1, at 23-24, 17.)  Plaintiffs' argument that they are proper *Ex Parte Young* defendants rests on a footnote in *Allied Artists*, 679 F.2d 656, 665 n.5 (6th Cir. 1982). (*See* Dkt. 67 at 14-20.) And for standing, Plaintiffs simply cite back to their *Ex Parte Young* argument. (Dkt. 67, at 29.)

Their reliance on *Allied Artists* is misplaced for three reasons. First, in the forty years since *Allied Artists*, Supreme Court and Sixth Circuit precedent have undermined, if not completely overruled, *Allied Artists*. In *Whole Woman's Health v. Jackson*, the Supreme Court rejected an attempt to sue Texas' Attorney General when he had no "enforcement authority" over a challenged abortion law. 595 U.S. 30, 43 (2021). The Court emphasized that it "has never recognized an unqualified right to pre-enforcement review of constitutional claims in federal court." *Id.* at 49. And it rejected plaintiffs' attempt to use the Attorney General as a stand-in for "any and all unnamed . . . persons who might seek to" enforce the law. *Id.* at 44. To the Supreme Court, it was

---

[2] Unless otherwise noted, all record citations are to the docket of the lead case, No. 2:23-cv-02670.

1

"obvious" and "straightforward" that a defendant's lack of "enforcement authority" put him beyond the reach of *Ex Parte Young*. *Id.* at 43. In the wake of that decision, the Sixth Circuit recently reiterated that "[t]he *Ex Parte Young* exception does not apply when a defendant state official has neither enforced nor threatened to enforce the allegedly unconstitutional state statute." *Block v. Canepa*, 74 F.4th 400, 406 (6th Cir. 2023). Indeed, as one district court recently recognized, General Skrmetti's lack of enforcement authority means any "purported injury (*i.e.*, fear of prosecution) is neither fairly traceable to [him] nor likely to be redressed by enjoining [him] from enforcing" the statute. *Ashe v. Hargett*, 2024 WL 923771, *7 (M.D. Tenn. Mar. 4, 2024).

Second, *Allied Artists* involved a "self-enforcing" statute that voided prohibited license agreements and provided defenses that could be raised by private litigants in contract suits. *Allied Artists Pictures Corp. v. Rhodes*, 496 F. Supp. 408, 425 (S.D. Ohio 1980). So pinning down a proper defendant responsible for enforcing the statute was difficult. But there is no such difficulty here. A violation of the Registration Act is a criminal offense. Tenn. Code Ann. § 40-39-208. And the Tennessee Constitution assigns the prosecution of that criminal offense to local district attorneys. Tenn. Code Ann. § 8-7-103(1). So, unlike *Allied Artists*, this is not a case where it is difficult to determine the proper defendant; Plaintiffs have simply chosen not to do so.

Third, the string of "TN-SORA" decisions cited by Plaintiffs are distinguishable from their challenges to the aggravated prostitution statute where *only* Governor Lee and General Skrmetti are defendants. (See Dkt. 67, at 15.) To be sure, those decisions cite *Allied Artists* to permit suit against Governor Lee in challenges to the Registration Act. But none of them stand for the proposition that Governor Lee or General Skrmetti are proper defendants in this challenge to a criminal offense statute enforced solely by local prosecutors and law enforcement officials. To hold that *Allied Artists* permits Governor Lee and General Skrmetti to be defendants in this challenge to a penal statute would leave the *Ex Parte Young* doctrine without meaning.

With the *Allied Artists* thread cut, Plaintiffs argue that Governor Lee has enforcement authority under the challenged statutes because, if "a local prosecutor . . . knowingly failed to enforce the . . . law, Governor Lee would have to direct the attorney general or another local prosecutor to initiate removal proceedings." (Dkt. 67 at 26.) But the ouster statute cited does not apply to "such officers as are by the constitution removable only and exclusively by methods other than those provided in this chapter." Tenn. Code Ann. § 8-47-101. District attorneys general are "such officers." Tenn. Const. art. 5, §§ 4-5; art. 6, § 6 (allowing removal of district attorneys only by impeachment or concurrent vote of General Assembly). Plaintiffs' argument is unfounded.

Nor can Plaintiffs shoehorn General Skrmetti into *Ex parte Young* by pointing to various non-enforcement authorities. Plaintiffs are wrong that enforcement authority arises merely because the Attorney General *defends* the constitutionality of state legislation. (Dkt. 67, at 18-20.) "The relevant question is not whether the Attorney General may defend the constitutionality of the statute, but whether he can prosecute plaintiffs under it." *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1032 (6th Cir. 2022). "[T]here is no imminent prosecution that a federal court could coerce *the Attorney General* to refrain from undertaking." *Id*.

Plaintiffs ignore *Universal Life Church* and further suggest that the statute authorizing the appointment of a pro tem prosecutor in the absence of a local district attorney gives General Skrmetti a sufficient connection to enforcement. (Dkt. 67, at 18-20.) But Tennessee law provides that, only "[i]f a district attorney general peremptorily and categorically refuses to prosecute all instances of a criminal offense without regard to facts or circumstances," General Skrmetti has mere authority to "petition the Supreme Court for appointment of a district attorney general pro tem." Tenn. Code Ann. § 8-7-106(a)(2). The Supreme Court then *independently* evaluates whether the district attorney has "refused to attend and prosecute." *Id*. And only then may the Supreme Court appoint "some other attorney as district attorney general pro tem." *Id*. "The Attorney

3

General never steps in." *Universal Life Church*, 35 F.4th at 1032. Thus, an enforcement action could be initiated only if (1) the district attorney categorically refuses to uphold his oath to enforce the law, (2) the Attorney General files a pro tem petition, (3) the Tennessee Supreme Court then independently decides to appoint a district attorney pro tem, and (4) that district attorney pro tem then decides to pursue a given prosecution. Plaintiffs' multi-step speculation does not plausibly show the required enforcement "choices . . . will be made." *R.K. ex rel. J.K. v. Lee*, 53 F.4th 995, 999 (6th Cir. 2022); *cf. Universal Life Church*, 35 F.4th at 1031-32 (6th Cir. 2022) (similar).

General Skrmetti has no enforcement authority over the challenged statutes. Plaintiffs brazenly admit that their goal is to make sure General Skrmetti is "bound by this case" and cannot defend the challenged statutes in other cases. (Dkt. 67 at 26.) But that goal does not qualify for the limited exception to sovereign immunity under *Ex Parte Young*, and if that reasoning sufficed, then *Universal Life Church* would have resulted differently.

## II.   The ADA and Rehabilitation Act Do Not Affect the State Officials' Sovereign Immunity. (State Officials' Memorandum Parts I, III(B)(3), and III(C)(5))

Nor can Plaintiffs salvage their claims by arguing generally that sovereign immunity is removed for ADA or Rehabilitation Act suits. (Dkt. 67, at 14.) *First*, Plaintiffs fail to state claims under those acts, meaning they cannot use them to pierce any of the State Officials' sovereign immunity. *See* Part II and III, *infra*; (Dkt. 66-1, at 33-54). Whatever effect those acts have in the abstract on sovereign immunity means nothing if they do not apply to the allegations here.

*Second*, the ADA could not constitutionally abrogate sovereign immunity for Plaintiffs' claims. Plaintiffs' response misapplies the *City of Boerne* test in arguing that Title II abrogates sovereign immunity in this context. (Dkt. 67, at 35-40.) Plaintiffs fail to address—let alone carry— their heightened burden of showing that the ADA can appropriately apply to States' classifications based on HIV status, which trigger only rational-basis review. *Compare* (Dkt. 67, at 35.), *with Tennessee v. Lane*, 541 U.S. 509, 523-24 (2004); *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531

4

U.S. 356, 369-70 (2001). Plaintiffs compound this error by arguing that Congress did not have to "make findings specific" to the type of discrimination that Plaintiffs allege here. Dkt. 67, at 38. But that ignores the Supreme Court's admonition that the burden of "curtailing a State's traditional general regulatory power" must be justified by a "pattern or practice of unconstitutional conduct" that Congress sets out to remedy. *City of Boerne*, 521 U.S. at 534-35. That is why, in *Lane*, the Supreme Court focused its analysis on a pattern of unconstitutional discrimination "[w]ith respect to the particular services at issue in this case," 541 U.S. at 527, and refused to "consider Title II, with its wide variety of applications, as an undifferentiated whole," *id*. at 530. Properly understood, the ADA cannot abrogate States' sovereign immunity in suits regarding alleged HIV discrimination unless they (1) show Congress considered a record of criminal laws which irrationally discriminated against individuals infected with fatal disease and (2) demonstrate erasing criminal statutes that penalize knowingly risky sexual conduct is a congruent and proportionate response to that record. Plaintiffs do neither. (Dkt. 66-1, at 41-45.)

In the end, Plaintiffs abandon the idea that Title II, as they construe its terms, is valid Section 5 legislation as applied to these claims. Instead, they offer federal regulation—not Title II—as the relevant prophylactic for constitutional violations. (Dkt. 67, at 36, 39-40.) But Plaintiffs' cite to federal regulation does not address itself to the right test under *City of Boerne*. Title II cannot be used to abrogate the State Officials' sovereign immunity from these claims.

*Third*, an abrogation or waiver of sovereign immunity under the ADA or Rehabilitation Act does not obviate the requirement that Plaintiffs have standing to sue the State Officials. The Court must address whether Plaintiffs have "separately" demonstrated standing to sue each of the State Officials. *Universal Life Church*, 35 F.4th at 1031. And the State Officials' lack of enforcement authority presents *both* an *Ex Parte Young* problem and a standing problem. *See* Part I, *supra*; (Dkt. 66-1, at 32-33). Plaintiffs' case for standing reduces to citing their arguments about

5

*Ex Parte Young*; they never engage with binding Sixth Circuit and Supreme Court precedent establishing their lack of standing. (Dkt. 67, at 29.)  And, as addressed above and in the State Officials' opening memorandum, they are wrong about *Ex Parte Young*. *See* Part I, *supra*; (Dkt. 66-1, at 22-26.)  So even with an abstract abrogation or waiver of sovereign immunity for Plaintiffs' claims, those claims still fail for lack of standing against the State Officials.

For the Rehabilitation Act, Plaintiffs' response to whether they have stated a claim for which sovereign immunity was abrogated is that States knew they were subject to lawsuits *in general* when accepting federal funding. But that fails to address whether one of the "conditions" of Rehabilitation Act funding was States accepting suits that result in having criminal laws superintended by the private litigants. States cannot "knowingly accept conditions of which they are 'unaware'" or which they are "unable to ascertain," *Kentucky v. Yellen*, 54 F.4th 325, 347-48 (6th Cir. 2022). Or, as the en banc Fourth Circuit put it, "[i]t is axiomatic" that statutory ambiguity "defeats altogether" a claim that Congress has "unambiguously conditioned the States' receipt of federal monies in the manner asserted." *Va.Dep't of Educ. v. Riley*, 106 F.3d 559, 567 (4th Cir. 1997) (en banc). The Rehabilitation Act does not offer a cause of action to challenge a State's criminal laws, and, even if that were an open question, any ambiguity would fail to satisfy the Spending-Clause's clear-statement rule, barring such a claim on sovereign immunity grounds.

**III.    OUTMemphis Lacks a Cause of Action Under the ADA or Rehabilitation Act. (State Officials' Memorandum Parts III(A) and III(C)(2))**

OUTMemphis has not alleged it has been discriminated against; it lacks a cause of action under Title II (Dkt. 66-1, at 33-35) or the Rehabilitation Act (Dkt. 66-1, at 49.)  OUTMemphis is wrong that "[n]othing more is required" to establish its ADA cause of action than that the organization "serves qualified individuals with disabilities." (Dkt. 67, at 31.)  OUTMemphis fails to show how that association leads to an "ADA injury." *Popovich v. Cuyahoga Cnty. Court of Common Pleas, Domestic Relations Div.*, 150 F. App'x 424, 426 (6th Cir. 2005). Title II prohibits

6

discrimination in the form of "*conduct directed at an entity* based on its relationship or association with disabled persons." *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 334 (6th Cir. 2002). In other words, an associational cause of action under the ADA belongs only to "individuals who are discriminated against because of their known association with an individual with a disability." *Id*. Because OUTMemphis does not assert that it suffered discrimination because of its association with disabled individuals, it has no cause of action. (Dkt. 66-1, at 34-35.)

*Dayton Veterans Residences Ltd. P'ship v. Dayton Metro. Hous. Auth*. illustrates that OUTMemphis lacks a cognizable ADA injury. 2023 WL 8081677 (6th Cir. Nov. 21, 2023). The plaintiff organization developed affordable housing for disabled veterans. *Id.* at *1. When the defendant later withdrew its financial support, the plaintiff sued under Title II. *Id*. There was no dispute that the plaintiff had sufficiently alleged that the defendant *acted* in a discriminatory manner against it. The opinion language that OUTMemphis quotes—that an entity must "show that it serves or is otherwise associated with disabled persons"—addresses only half the inquiry.

*Innovative Health Sys. Inc., v. City of White Plains* does not help OUTMemphis. 117 F.3d 37, 47 (2d Cir. 1997). That case, too, made clear that "serv[ing]" the disabled is not enough for standing. There must also be discriminatory "conduct directed at" the plaintiff because of the association. *Id*. Here, OUTMemphis spends the bulk of their pleadings explaining its "relationship [and] association with" individuals with HIV, but it has failed to identify "conduct" by the named State Officials "directed at" OUTMemphis "based on" its relationship with HIV-positive individuals. This failure dooms OUTMemphis' claims, as the opinions it cites confirm. *See, e.g., Turner v. City of Englewood*, 195 F. App'x 346, 352 (6th Cir. 2006) (finding a cause of action for a landlord because "the rezoning [of his property] itself is the injury" caused by the government).

OUTMemphis is like the plaintiff in *Popovich*. There, the Sixth Circuit concluded that plaintiff lacked a cause of action based on a relationship with her disabled father. 150 F. App'x at

7

427. The parties did not dispute that the plaintiff was associated her disabled father. *Id*. Nor did they dispute that she had sustained some injury because of that association. *Id*. But "[u]nlike the treatment centers in *Innovative Health Systems* and *MX Group*, both of which were denied permits to operate, [plaintiff] [was] not . . . denied access to or participation in any of the public services covered by Title II." *Id*. The absence of any discrimination toward plaintiff meant she "ha[d] not suffered an 'ADA injury.'" *Id*.; *see Est. of Estrada v. U.S. Dep't of Veterans Affs*., 2014 WL 794143, at *4 (N.D. Ohio Feb. 26, 2014) (not all injuries "amount to a denial of benefits under the Rehabilitation Act…").

OUTMemphis spends considerable effort explaining its "relationship or association with" individuals with HIV. But its lack of any cognizable ADA injury requires dismissal.

## IV. Plaintiffs' Limitless Interpretation of Title II Is Wrong. (State Officials' Memorandum Part III(B)(2))

The plain text of Title II guarantees equal access to the programming, services, and benefits States provide. (Dkt. 66-1, at 37-41.) Plaintiffs snatch the word "activities" and the residual clause out of context to convert Title II into a super-regulation of any public action. (Dkt. 67, at 31-35.)

The word "activities" in Title II is not boundless. Plaintiffs push Title II past all reasonable interpretation when they say that "[w]e are all 'eligible' for participation in the criminal legal system" and that, by committing a felony, individuals are "'qualified' for a conviction of Aggravated Prostitution and resultant lifetime sex offender registration." (Dkt. 67 at 34.) The term "qualified" in Title II means qualification for a program, service, or activity; and wrongful exclusion must be due to disability. 42 U.S.C. §§ 12131, 12132. But Plaintiffs surely are not claiming exclusion from an aggravated prostitution conviction. (Dkt. 67, at 34.) Plaintiff's contorted interpretation of the term "activities" and the residual clause exceeds those limits.

Plaintiffs wrongly suggest that the "reasonableness" limits of Title II only "arises with respect to potential accommodations" cases. (Dkt. 67, at 33.) Interpretations of Title II in both

8

reasonable-accommodation *and* intentional-discrimination cases are "subject… to the bounds of reasonableness." *Tri-Cities Holdings, LLC v. Tenn. Admin. Procedures Div*., 726 F. App'x 298, 308 (6th Cir. 2018) (quoting *Johnson v. City of Saline*, 151 F.3d 564, 571 (6th Cir. 1998). That Plaintiffs even need to argue that the principle of reasonableness "does not operate to limit" the scope of Title II shows that their interpretation exceeds it. (Dkt. 67, at 33.)

The Supreme Court has set reasonable boundaries for Title II's scope since *Johnson*, 151 F.3d at 571, which Plaintiffs rely on heavily. Title II's focus is access to services, programs, and activities in which an individual *participates* and *benefits*. *City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 609, (2015) (Title II "would apply to an arrest if an arrest is an 'activity' in which the arrestee 'participates' or from which the arrestee may 'benefit.'"). The Court also applied a reasonableness standard in *Pennsylvania Dep't of Corr. v. Yeskey* when it recognized that Title II applied when a prison offered inmates "recreational 'activities,' medical 'services,' and educational and vocational 'programs,' all of which could 'benefit' the prisoners (and any of which disabled prisoners could be 'excluded from participation in')." 524 U.S. 206, 210 (1998). There, it was not mere imprisonment that implicated Title II, but rather the attendant rehabilitation benefits that a "modern prison" could offer inmates. *Id*. Title II only remedies interference with a disabled individual's participation in, or benefit from, a public service, program, or activity.

The Sixth Circuit has likewise focused on whether an activity confers a "public benefit." *Tri-Cities Holdings*, 726 F. App'x at 312 (a certificate of need to entity seeking to build a medical clinic was a "public benefit" that fell within Title II). But the "scope of a benefit cannot be so 'amorphous' as to sweep in protection against all possible outcomes." *Id*. at 315; *accord Alexander v. Choate*, 469 U.S. 287, 303 (1985) (rejecting the "boundless notion" that "adequate health care" was a sufficiently concrete "public benefit" implicating Title II). Here, "participation in the criminal legal system" is too vague and indefinite to be a "public benefit" for purposes of Title II.

9

Under Title II, a criminal sentence does not confer a "public benefit," and a felony conviction is not something for which one "qualifies." Such an interpretation bends Congress's words past their breaking point.

V.  **Aggravated Prostitution Involves More than Having HIV. (State Officials' Memorandum Parts III(B)(2), III(C)(3), and IV)**

Throughout their response, Plaintiffs ignore the plain text of the aggravated prostitution statute to try to keep their claims alive on the merits. They argue that the challenged laws "treat individuals who engage in the exact same conduct (prostitution) who are not living with HIV more leniently than those who are." (Dkt. 67, at 50.) But this ignores that the challenged laws also treat individuals who engage in prostitution *without* knowledge of their HIV status more leniently. Tenn. Code Ann. § 39-13-516(a) (requiring, as element of offense, that prostitution must be committed "knowing that such person is infected with HIV"). This illustrates that the aggravated prostitution statute does not discriminate solely on the basis of an individual's HIV status, but their knowing conduct. Plaintiffs' refusal to engage with this nuance reveals the weakness of their challenges to the aggravated prostitution statute—all of which hinge on proving that the State Officials discriminate based on disability status, not knowing conduct.

VI. **Heightened-Rational-Basis Review Does Not Apply. (State Officials' Memorandum Part IV(A))**

The aggravated prostitution statute and the attendant registration requirement easily clear rational basis review. (Dkt. 66-1, at 54-58.) Plaintiffs misstate the applicable standard when they say "heightened rational basis" applies in instances where "individual liberty and human dignity are at stake." (Dkt. 67, at 60.) Heightened-rational-basis review has been used by the Supreme Court only to strike down state and federal statutes *motivated by animus*. *Compare City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985), *with U.S. Dep't of Agric. V. Moreno*, 413 U.S. 528, 534 (1973). Naturally, laws motivated by animus lack a legitimate interest

10

and must fail. But where there is no allegation or evidence that the law is infected with animus, heightened-rational-basis review is inappropriate. *See, e.g.*, *Gallinger v. Becerra*, 898 F.3d 1012, 1021 (9th Cir. 2018) (declining to apply heightened rational basis where plaintiffs failed to plausibly plead that the legislature acted with a desire to harm); *Carney v. Okla. Dep't of Pub. Safety*, 875 F.3d 1347, 1354 (10th Cir. 2017) (state sex offender registration law "is not an aberrational law indicative of hostile lawmaking," and therefore the court's "analysis rests upon traditional rational basis review").

Heightened-rational-basis review is also inapplicable where the legislature had an independent justification for the law. *See Gallagher v. City of Clayton*, 699 F.3d 1013, 1020 (8th Cir. 2012). That is, it "only applies where there is *no other legitimate state interest* for the legislation that survives scrutiny." *Id*. (holding that because ordinance banning outdoor smoking has health-based justification, it "is not the product solely of animus"). "It is only when courts can hypothesize no rational basis for the action that allegations of animus come into play." *Flying J Inc. v. City of New Haven*, 549 F.3d 538, 547 (7th Cir. 2008).

Plaintiffs do not allege that the challenged laws are a product of animus. They instead allege that "[h]uge advances in the treatment of HIV" have undermined the law's underlying rationality, and that "Tennessee's HIV criminalization scheme takes none of this science into account." (Dkt. 62 at ¶¶ 23, 63.) But that theory does not warrant heightened-rational-basis review.

Plaintiffs are just as wrong to suggest that the Court can ignore the rational basis that no doubt existed when laws were enacted and instead examine the law exclusively "based on current science." (Dkt. 67, at 61.)  That Plaintiffs "simply disagree with" Tennessee's "assessment of the risks and the right response to those risks" does not "suffice to invalidate a democratically enacted law on rational-basis grounds." *L. W. by & through Williams v. Skrmetti*, 83 F.4th 460, 488 (6th Cir. 2023). It is "hazardous" for the court to "step in and say that what was rational in the past has

11

been made irrational by the passage of time, change of circumstances, or the availability of new knowledge." *United States v. Then*, 56 F.3d 464, 468 (2d Cir. 1995) (Calabresi, J., concurring.); *accord Theile v. Michigan*, 891 F.3d 240, 245 (6th Cir. 2018). Doing so would require the Court to "disregard the legislature's initial, rational intent" and instead examine "whether the passage of time has rendered its reasoning less powerful." *Poughkeepsie Supermarket Corp. v. Cnty. of Dutchess, N.Y.*, 140 F. Supp. 3d 309, 317 (S.D.N.Y. 2015). "Once a law is enacted and passes constitutional muster, it is the political process that must change it if its costs no longer exceed its benefits." *Id*. The challenged laws here easily clear the "low form of scrutiny" that is rational-basis review. *Phillips v. Snyder*, 836 F.3d 707, 718 (6th Cir. 2016).

**VII.    Plaintiffs Underscore the Inappropriate Nature of the Relief Sought. (State Officials' Memorandum Part VI)**

Plaintiffs claim their requested relief is limited to a having the Court "enjoin named defendants from taking specified unlawful actions." (Dkt. 67, at 70.)  But their request goes much further. They ask for an order removing all effected individuals from the registry (Dkt. 62, Prayer for Relief at (E)), expunging their records (*Id*. at (F)), issuing a vague "alert" to an indefinite number of entities that each individual is no longer on the registry (*Id*. at (G)), and giving *Plaintiffs* the "authority to monitor the compliance" of the State Officials. (*Id*. at (I)). This far exceeds the suggestion that Plaintiffs are simply seeking to enjoin specified unlawful actions.

The Court lacks free-floating power to declare Plaintiffs' rights in against "nonparties" who have had no opportunity to defend themselves. *L.W. ex rel. Skrmetti*, 83 F.4th 460, 490 (6th Cir. 2023). Courts may not grant an injunction "so broad as to make punishable the conduct of persons who act independently and whose rights have not been adjudged according to law." *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 13 (1945); *see also Scott v. Donald*, 165 U.S. 107, 117 (1897).

## CONCLUSION

The Amended Complaint should be dismissed in its entirety.

Respectfully Submitted,

JONATHAN SKRMETTI
Attorney General and Reporter

*/s/ John R. Glover*
JOHN R. GLOVER (BPR # 037772)
Assistant Attorney General

CODY N. BRANDON (BPR# 037504)
Managing Attorney
Assistant Attorney General

DAVID RUDOLPH (BPR# 13402)
Senior Assistant Attorney General

Law Enforcement &
Special Prosecutions Division
Office of the Tennessee
Attorney General & Reporter
PO Box 20207
Nashville, TN  37202
Off. (615) 532-2552
Fax (615) 532-4892
John.Glover@ag.tn.gov
Cody.Brandon@ag.tn.gov
David.Rudolph@ag.tn.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on April 11, 2024, a true and exact copy of the foregoing was served via the court's service system upon counsel as follows:

Stella Yarbrough (BPR No. 033637)
Jeff Preptit (BPR No. 038451)
Lucas Cameron-Vaughn (BPR No. 036284)
ACLU FOUNDATION OF TENNESSEE
P.O. Box 120160
Nashville, TN 37212
Phone: (615) 320-7142
SYarbrough@aclu-tn.rog
JPreptit@aclu-tn.org
Lucas@aclu-tn.org

Alex Agathocleous (NY Bar 4227062)
Alexis Alvarez (NY Bar 5854278)
Jon W. Davidson (CA Bar 89301)
Rachel Meeropol (NY Bar 4100954)
AMERICAN CIVIL LIBERTIES UNION
125 Broad St., New York, NY 10004
Phone: (929) 585-0061
AAgathocleous@aclu.org
AlexisA@aclus.org
JonDavidson@aclu.org
RMeeropol@aclu.org

Lynly S. Egyes (NY Bar 4838025)
Milo Inglehart (NY Bar 5817937)
TRANSGENDER LAW CENTER
594 Dean Street, Suite 11
Brooklyn, NY 11238
Phone: 510 587-9898 Ext. 353
Lynly@transgenderlawcenter.org
Milo@transgenderlawcenter.org

Dale Melchert (NY Bar 5366554)
TRANSGENDER LAW CENTER
P.O. Box 70976
Oakland, CA 94612
Phone: (510) 587-9696 Ext. 354
Dale@transgenderlawcenter.org
*Counsel for Plaintiffs*

Stephanie Berger
Ali Szemanski

14

U.S. Department of Justice
150 M Street NE
Washington, DC 20002
*Counsel for the United States*

              */s/ John R. Glover*
              JOHN R. GLOVER (BPR # 037772)
              Assistant Attorney General