# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

| | |
|---|---|
| **OUTMEMPHIS; MICHELLE ANDERSON; JANE DOE 2; JANE DOE 3; and JANE DOE 4,** | |
| **Plaintiffs,** | |
| v. | |
| **BILL LEE, in his official capacity as Governor of Tennessee, JONATHAN SKRMETTI, in his official capacity as Attorney General and Reporter of Tennessee; DAVID RAUSCH, in his official capacity as Director of the Tennessee Bureau of Investigation; and FRANK STRADA, in his official capacity as Commissioner of the Tennessee Department of Corrections** | |
| **Defendants.** | **Case Nos. 2:23-cv-2670** |
| | **2:24-cv-2101** |
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | **CHIEF JUDGE LIPMAN** |
| v. | |
| **STATE OF TENNESSEE, and TENNESSEE BUREAU OF INVESTIGATION,** | |
| **Defendants** | |

---

## UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

---

## INTRODUCTION

Tennessee's aggravated prostitution criminal law targets people living with human immunodeficiency virus (HIV).  Under the law, people engaging in the exact same conduct are treated differently depending upon their HIV status.  People with HIV, a disability, may be convicted for aggravated prostitution, while people without HIV may only be convicted of misdemeanor prostitution.  This is true regardless of whether the conduct at issue posed any actual risk of harm.  People convicted of aggravated prostitution face longer periods of incarceration, higher fines, and mandatory sex offender registration, in most cases, for life. Defendants publicly identify many of these individuals as violent sex offenders on Tennessee's sex offender registry website.  Once labeled as a "violent" sex offender, people struggle to find places to live and work and often cannot spend time with friends and family members if children are present.  These harsher penalties are solely due to HIV status.

The Americans with Disabilities Act (ADA) was enacted to prevent this sort of "pervasive unequal treatment in the administration of state services and programs, including systematic deprivations of fundamental rights." *Tennessee v. Lane*, 541 U.S. 509, 524 (2004). Defendants cloak their unequal treatment under the guise of "public health," but Tennessee's law punishes people living with HIV more harshly even when there is no risk that an individual could spread HIV.  Tennessee and the Tennessee Bureau of Investigation (TBI) violate Title II of the ADA by enforcing and maintaining this discriminatory law.

To avoid responsibility for violating the ADA, Defendants ignore clear statutory language, binding precedent, instructive legislative history, and procedural rules.  None of the Defendants' arguments has merit.  First, the United States may enforce Title II, and Defendants' interpretation disregards the remedies Congress incorporated into Title II.  Second, the breadth of

1

Title II's coverage encompasses Tennessee's implementation and enforcement of its aggravated prostitution statute.  Third, Tennessee and the TBI are proper defendants to this suit.  And finally, any arguments about the scope of the relief are improper at this stage.  Accordingly, this Court should deny Defendants' Motion to Dismiss, ECF No. 28.

## BACKGROUND

Tennessee, including the TBI, maintains and enforces Tennessee's aggravated prostitution statute, Tenn. Code Ann. § 39-13-516, which discriminates against people with HIV on the basis of their disability.  Compl. ¶ 2.  This law subjects people living with HIV to harsher criminal penalties for conduct that would otherwise constitute misdemeanor prostitution, because of their HIV status and regardless of any actual risk of harm.[1]  Compl. ¶¶ 2, 13, 16.  Indeed, the sponsor of a recently passed Tennessee bill to amend the law confirmed that aggravated prostitution is a "status offense," not premised on any actual conduct.  The fact that someone charged with prostitution has HIV is what triggers these penalties.[2]

---

[1] In its motion to dismiss, Defendants appear to construe information published by the Centers for Disease Control and Prevention (CDC) about risk as statements on behalf of the entire federal government.  *See* ECF No. 28-1 at 1, 6.  The CDC is a federal agency with the mission of protecting public health.  The Department of Justice is a federal agency with the mission of the enforcement of federal law, including the ADA.  This suit is consistent with both agencies' missions, as there are ways to serve the public health without unnecessarily violating the rights of people with disabilities.

[2] An Act to amend Tennessee Code Annotated, Title 39 and Title 40, relative to aggravated prostitution, S.B. 181, 2023 Sess. (Tenn. 2024), https://tnga.granicus.com/player/clip/29359?view_id=703&meta_id=790049&redirect=true (statement of Sen. Walley at 12:50-13:15); *see also Bradley v. Jefferson Cnty. Pub. Sch.*, 598 F. Supp. 3d 552, 558 (W.D. Ky. 2022) (allowing "judicial notice of information posted on official public websites of government [entities]").  S.B. 181 amended the law such that, beginning July 1, 2024, individuals who are newly convicted of aggravated prostitution will no longer be required to register as sex offenders.  *See* ECF No. 19, Ex. 1 (2024 Tenn. Laws Pub. Ch. 545).  In addition, although the aggravated prostitution law requires that a person engage in conduct while "knowing that such person is infected with HIV," this language supplies a mens rea for the criminal offense and does not change that it is the fact of their HIV status that makes the

The harms of Tennessee's aggravated prostitution law do not end at conviction; rather, the State's enforcement of the sex offender registry requirements continues to inflict harm for years and sometimes indefinitely.  Individuals convicted under the law are required to register, most as violent sexual offenders, on Tennessee's sex offender registry, maintained by the TBI. Compl. ¶¶ 19, 21-23.  This publicly searchable registry contains extensive personal information about individuals convicted under this law, including the fact that they have HIV.  Compl. ¶¶ 35-36.  Because of Tennessee's sex offender restrictions, individuals convicted of aggravated prostitution have difficulty finding employment and housing.  Compl. ¶¶ 25-26, 62.  Some individuals can in theory seek removal from the registry after 10 years of substantial compliance, subject to the TBI's discretion; however, most individuals have more than one conviction for aggravated prostitution or were convicted after June 30, 2010, so they must register for life. Compl. ¶ 21.[3]

If someone violates the registry requirements, the TBI must inform district attorneys, designated law enforcement agencies, and others who directly supervise the individual. Compl. ¶ 32.  The TBI also receives a portion of the $150 annual registration fee paid by

---

difference in whether the person can be charged with a felony instead of a misdemeanor for the same conduct.

[3] According to S.B. 181, individuals convicted before July 1, 2024, who are on the registry must file a request for termination of the sex offender requirements with the TBI.  *See* ECF No. 19, Exhibit 1 (2024 Tenn. Laws Pub. Ch. 545).  Unless the TBI receives and chooses to exercise its discretion to grant requests for termination, individuals will still be subject to many of the harms described in the Complaint.  This interpretation of the plain text of S.B. 181 aligns with statements made by its sponsor just before the bill was passed.  *See* An Act to amend Tennessee Code Annotated, Title 39 and Title 40, relative to aggravated prostitution, S.B. 181, 2023 Sess. (Tenn. 2024), https://tnga.granicus.com/player/clip/29617?view_id=703&meta_id=799859&redirect=true (statement of Rep. Ragan at 2:03:57-2:04:11) (indicating that individuals with prior convictions can request removal if they can establish a "clean record" and "good cause" for termination of their registry requirements).

individuals convicted of aggravated prostitution.  Compl. ¶ 30.  Finally, Tennessee issues driver's licenses to individuals convicted of aggravated prostitution that label them as violent sex offenders.  Compl. ¶ 34.

## LEGAL STANDARD

Under Rule 12(b)(6), a plaintiff must allege facts that "'state a claim to relief that is plausible on its face' and that, if accepted as true, are sufficient to 'raise a right to relief above the speculative level.'"  *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).  A court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff."  *DirecTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  A plaintiff's allegations must go beyond "labels and conclusions, [or] a formulaic recitation of the elements of a cause of action."  *Wamer v. Univ. of Toledo*, 27 F.4th 461, 466 (6th Cir. 2022) (quoting *Twombly*, 550 U.S. at 555).  When reviewing a facial attack to a complaint under Rule 12(b)(1) for lack of standing, courts must employ the same approach as reviewing a 12(b)(6) motion by "accept[ing] the allegations set forth in the complaint as true" while "drawing all inferences in favor of the plaintiff."  *Hile v. Michigan*, 86 F.4th 269, 273 (6th Cir. 2023) (quoting *Mosley v. Kohl's Dep't Stores, Inc.*, 942 F.3d 752, 756 (6th Cir. 2019)).

## ARGUMENT

The United States has stated a plausible claim for relief under the ADA.  First, the United States can bring suit under Title II.  Second, Tennessee's maintenance and enforcement of its state criminal law constitutes a program, service, or activity under Title II.  Third, the United States has named proper defendants.  Fourth, Tennessee's objections to the remedies are premature and not suited for resolution under Rule 12(b)(6).  Accordingly, Tennessee's motion

to dismiss should be denied.

## I.      The Attorney General May Sue under Title II.

Contrary to Defendants' argument, the text, purposes, and legislative history of the ADA establish that the Attorney General can bring enforcement actions against public entities under Title II.  The relevant section of Title II, 42 U.S.C. § 12133 provides "persons alleging discrimination" with the "remedies, procedures, and rights" set out in the Rehabilitation Act of 1973 and Title VI of the Civil Rights Act of 1964.  One of those "remedies, procedures, and rights" is the ability to file an administrative complaint that may result in a suit by the Attorney General.  Title II thus grants the Attorney General a cause of action to enforce the statute, as the Eleventh Circuit—and every court outside of the Eleventh Circuit to have considered the question—has held.

   A.      *Congress Plainly Authorized Civil Actions by the Attorney General by Incorporating the "Remedies, Procedures, and Rights" under the Rehabilitation Act and Title VI in 42 U.S.C. § 12133.*

Title II's enforcement provision grants "any person alleging discrimination" the "remedies, procedures, and rights set forth in [Section 505 of the Rehabilitation Act, 29 U.S.C. § 794a]."  42 U.S.C. § 12133.  Section 505 of the Rehabilitation Act, in turn, incorporates "[t]he remedies, procedures, and rights set forth in [Title VI]."  29 U.S.C. § 794a(a)(2).  As the Sixth Circuit has explained, the "upshot" of these provisions is that "[t]he remedies available for violations of Title II . . . and . . . the Rehabilitation Act are 'coextensive' with those for Title VI."  *Jones v. City of Detroit*, 20 F.4th 1117, 1119 (6th Cir. 2021) (quoting *Barnes v. Gorman*, 536 U.S. 181, 185 (2002)).  Title VI provides that compliance with the statute may be "effected" by (1) terminating federal assistance to violators after an administrative proceeding or (2) "any other means authorized by law."  42 U.S.C. § 2000d-1.

The potential for the Attorney General to bring suit following the submission of an administrative complaint by a person alleging discrimination has long been a part of the Title VI and Rehabilitation Act remedial schemes, and thus such enforcement actions are also among the "remedies, procedures, and rights" available to such persons under Title II. *See United States v. Florida*, 938 F.3d 1221, 1229-38, 1241-48 (11th Cir. 2019), *cert. denied*, 143 S. Ct. 89 (2022) (holding that rights and remedies under Title II are coextensive with those under Title VI and Section 504 of the Rehabilitation Act, including administrative complaint process culminating in suits by the Attorney General). Specifically, regulations and guidelines issued shortly after Title VI's enactment establish that persons alleging discrimination under that statute may seek relief through an administrative complaint, which triggers a process that may end in an "appropriate court action" by the Attorney General. 28 C.F.R. § 50.3(c)(I)(B)(1) (DOJ guidelines); *see also, e.g.*, 45 C.F.R. §§ 80.7, 80.8 (stating that filing of an administrative complaint may culminate in referral to DOJ for appropriate enforcement proceedings); *accord* 28 C.F.R. §§ 42.411(a), 42.412(b) ("coordination" regulations explaining that agencies can refer cases to DOJ for "litigation"). Regulations promulgated after passage of the Rehabilitation Act adopt this same enforcement process, including the possibility of suits by the Attorney General after an administrative process. *See, e.g.*, 45 C.F.R. 84.61; 45 C.F.R. 85.5(a)(1) (1978) (currently codified at 28 C.F.R. 41.5(a)(1)) ("coordination" regulations with instructions to all agencies).

Moreover, the United States' ability to pursue enforcement actions under both Title VI and Section 504 of the Rehabilitation Act was well established in the courts at the time of the ADA's passage in 1990. *See, e.g., United States v. Baylor Univ. Med. Ctr.*, 736 F.2d 1039, 1050 (5th Cir. 1984); *Nat'l Black Police Ass'n, Inc. v. Velde*, 712 F.2d 569, 575 (D.C. Cir. 1983); *United States v. Marion Cnty. Sch. Dist.*, 625 F.2d 607, 612-13 (5th Cir. 1980); *Adams v.*

*Richardson*, 480 F.2d 1159, 1161 n.1, 1164 (D.C. Cir. 1973) (en banc); *United States v. Louisiana*, 692 F. Supp. 642, 649 (E.D. La. 1988), *vacated on other grounds*, 751 F. Supp. 606 (E.D. La. 1990); *United States v. Tatum Indep. Sch. Dist.*, 306 F. Supp. 285, 288 (E.D. Tex. 1969).

Thus, Congress's decision in Section 12133 to provide persons alleging discrimination under Title II the same "remedies, procedures, and rights" set forth in Title VI and the Rehabilitation Act granted such persons a bundle of well-established remedies and rights, including the right under the cross-referenced statutes to pursue a federal administrative enforcement process that could culminate in a suit by the Attorney General.  Indeed, "where, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute."  *Lorillard v. Pons*, 434 U.S. 575, 581 (1978); *see also Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) ("When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well.").  Section 12133 thus grants the Attorney General the same enforcement powers under Title II that regulations and judicial decisions had uniformly established for Title VI and Section 504 of the Rehabilitation Act—including the power to bring civil actions following administrative proceedings initiated by a person alleging discrimination.

In accordance with Title II's plain text incorporating the remedial schemes of Title VI and the Rehabilitation Act, the Eleventh Circuit—and every other court outside of that circuit to have considered the question—have recognized the United States' authority to sue to enforce Title II.  *See Florida*, 938 F.3d at 1246-48, 1250 (Boggs, J., by designation); *United States v.*

*Mississippi*, No. 3:16-cv-622, 2019 WL 2092569, at *2 (S.D. Miss. May 13, 2019) (rejecting

State's argument that Title II lacked explicit reference to federal enforcement actions), *rev'd on*

*other grounds*, 82 F.4th 387 (5th Cir. 2023); *United States v. Harris Cnty.*, No. 4:16-cv-2331,

2017 WL 7692396, at *1 (S.D. Tex. Apr. 26, 2017) (explaining that "the plain language of the

ADA, its legislative history, and the implementing regulations clearly establish that the United

States has authority to bring lawsuits under Title II of the ADA"); *United States v. Virginia*, No.

3:12-cv-59, 2012 WL 13034148, at *2-3 (E.D. Va. June 5, 2012) ("As a threshold matter, the

United States has the authority to initiate legal action to enforce Title II of the ADA."); *Smith v.*

*City of Phila.*, 345 F. Supp. 2d 482, 489 (E.D. Pa. 2004) (noting that United States has a

"separate and independent basis for jurisdiction" under Title II (quoting *Fuller v. Volk*, 351 F.2d

323, 328 (3d Cir. 1965)); *United States v. City & Cnty. of Denver*, 927 F. Supp. 1396, 1399-1400

(D. Colo. 1996) (recognizing United States' authority to bring Title II action).

Defendants' remaining arguments that the Attorney General may not enforce Title II are

meritless.  First, the United States' authority to enforce Title II does not depend on the Attorney

General himself being a "person alleging discrimination" under § 12133.  Defendants' reliance

on *Return Mail, Inc. v. United States Postal Service*, 587 U.S. 618 (2019), for the proposition

that "the sovereign is not a person," ECF No. 28-1 at 10-11, is therefore beside the point.

Additionally, Defendants' assertion that the Eleventh Circuit's decision in *Florida* was premised

on the Attorney General being a "person alleging discrimination" misunderstands that decision.

*See United States v. Sec'y Fla. Agency for Health Care Admin.*, 21 F.4th 730, 733 (11th Cir.

2021) (Jill Pryor, J., respecting denial of rehearing en banc) (explaining that the argument that

the Attorney General is not a person under the ADA "either takes aim at a strawman or rests on a

misunderstanding of the panel opinion and the Attorney General's role in this lawsuit" and

explaining that the *Florida* court "never suggested, much less held, that the Attorney General was the 'person' referred to in § 12133"); *Florida*, 938 F.3d at 1227-28, 1244-45, 1250 (rejecting Florida's argument that "because the Attorney General is not a 'person alleging discrimination," he has no right to sue under Title II, reasoning that the question instead turns on the "remedies, procedures, and rights" Title II granted such persons).

Second, Defendants' reliance on the distinction that the Rehabilitation Act and Title VI are Spending Clause statutes misses the point.  Whatever the legal basis for the remedies, procedures, and rights available under Title VI and the Rehabilitation Act, Congress expressly directed that those same remedies be available under Title II.  As the Supreme Court explained in *Barnes v. Gorman*, Title II "could not be clearer that the 'remedies, procedures, and rights'" it provides "are the same as the 'remedies, procedures, and rights'" set forth in Title VI and the Rehabilitation Act.  536 U.S. 181, 189 n.3 (2002) (quoting 42 U.S.C. § 12133).  "These explicit provisions," the Court held, "make discussion of the ADA's status as a 'non Spending Clause' tort statute quite irrelevant" in determining the scope of the remedies it provides.  *Id.*  The Sixth Circuit similarly held in *Jones v. City of Detroit* that case law interpreting a closely-related Spending Clause statute controlled a question concerning the remedies available under Title II, even though the ADA was enacted under the Fourteenth Amendment, reasoning that such a "distinction makes no difference."  20 F.4th 1117, 1122 (6th Cir. 2021) (explaining that when Congress "define[s] the remedies available under any kind of legislation" by incorporating those from another statute, any "concerns about the kinds of remedies available under different types of congressional power is 'quite irrelevant'" (quoting *Barnes*, 536 U.S. at 189 n.3)).

Thus, by enacting 42 U.S.C. § 12133, Congress incorporated a well-established enforcement scheme, including lawsuits by the United States following administrative

proceedings, to accomplish Title II's anti-discrimination goals.

     B.    *A Neighboring Provision of the ADA, the Statute's Purpose, and its Legislative History Confirm the Attorney General's Enforcement Authority under Title II.*

A neighboring provision of the ADA, the statute's codified purpose, and its legislative history reinforce the conclusion that 42 U.S.C. § 12133 grants the Attorney General authority to file civil actions following an administrative complaint process. Moreover, differences between the enforcement provisions of Title II and Titles I and III do not counsel against this interpretation.

First, a provision of Title II that neighbors its enforcement provision confirms that Title II incorporates the administrative complaint processes used to enforce Title VI and Section 504 of the Rehabilitation Act—processes, as explained, that can culminate in lawsuits by the Attorney General. In this neighboring provision, 42 U.S.C. § 12134, Congress required the Attorney General to "promulgate regulations" under Title II that are "consistent with" the Rehabilitation Act's "coordination regulations" found in "part 41 of title 28, Code of Federal Regulations." 42 U.S.C. § 12134(a)-(b). One such Rehabilitation Act coordination regulation directs federal agencies to "establish a system for the enforcement" of the Act that "shall include . . . [t]he enforcement and hearing procedures that the agency has adopted for the enforcement of [T]itle VI." 28 C.F.R. § 41.5(a)(1). Thus, Section 12134 requires the establishment of an administrative scheme for enforcing Title II that is "consistent" with that already established under Title VI: a scheme that can lead to enforcement actions by the Attorney General.[4]

---

[4] Contrary to Defendants' suggestion, ECF No. 28-1 at 8 n.22, the Attorney General's regulations implementing Title II do just that. *See* 28 C.F.R. §§ 35.170, 35.172, 35.173(b) (providing for administrative proceedings); *id.* § 35.174 (directing agencies to "refer [unresolved] matter[s] to the Attorney General with a recommendation for appropriate action," which may include a lawsuit); *id.* §§ 35.175, 35.178 (contemplating judicial enforcement).

That Congress intended this makes perfect sense: one of Congress's purposes in enacting the ADA—a purpose codified in the U.S. Code—was to "ensure that the Federal Government plays a central role in enforcing the standards established [in the statute] on behalf of individuals with disabilities." 42 U.S.C. § 12101(b)(3). Both the House and Senate committee reports confirm that Congress intended that "the *major enforcement sanction* for the Federal government" in Title II matters "will be referral of cases by . . . Federal agencies to the *Department of Justice*," so that the Department "may then proceed to file suits in *Federal district court*." H.R. Rep. No. 101-485, pt. 2, at 98 (1990) (emphasis added); S. Rep. No. 101-116, at 57-58 (1989) (same). *See also* H.R. Rep. No. 101-485, pt. 2, at 367 (specifying that the drafters "chose[ ] not to list all the types of actions that are included within the term 'discrimination,' as was done in titles I and III, because [Title II] essentially simply extends the anti-discrimination prohibition embodied in section 504 to all actions of state and local governments"). The purposes of the statute and its legislative history therefore confirm that Congress intended the United States to have a cause of action under Title II.

Contrary to Defendants' arguments, differences between the enforcement provisions in Titles I, II, and III do not undermine such an interpretation, and reflect that Congress was legislating against different legal backdrops in each instance. *See, e.g.*, *United States v. Sec'y Fla. Agency for Health Care Admin.*, 21 F.4th 730, 742-45 (11th Cir. 2021) (Jill Pryor, J., respecting denial of rehearing en banc) (explaining that "the different language Congress used in the enforcement provisions of each title merely reflects the different approaches that Congress took to incorporate existing law" and "does not reflect different remedies"). The enforcement provisions of Titles I and III do contain express references to the Attorney General, but each reference was necessary to convey Congress's intended meaning.

11

Title I's enforcement provision cross-references five complex provisions of Title VII of the Civil Rights Act of 1964 that expressly spread enforcement authority between persons alleging discrimination, the Equal Employment Opportunity Commission, and the Attorney General.  42 U.S.C. § 12117(a).  Because the provisions provide certain "powers, remedies, and procedures" to each actor, it was imperative for Title I's enforcement provision to reference each actor when granting them the same respective "powers, remedies, and procedures."  *Id.*  By contrast, expressly referencing the Attorney General in Title II's enforcement provision was unnecessary and would have been redundant because 42 U.S.C. § 12133 incorporates the Rehabilitation Act's enforcement provision—a provision granting certain rights and remedies to "person[s] aggrieved," 29 U.S.C. § 794a(a)(2), including the right to pursue administrative proceedings that may culminate in an enforcement action by the Attorney General.  As Defendants themselves acknowledge, Congress generally *avoids* redundancies in drafting its statutes.  ECF No. 28-1 at 10 (citing *Kungys v. United States*, 485 U.S. 759, 778 (1988)).

As for Title III, it incorporates a preexisting enforcement scheme from another part of the Civil Rights Act of 1964, *see* 42 U.S.C. § 12188(a), and also expands on those remedies by permitting the Attorney General to seek damages and civil penalties, *id.* § 12188(b), which were previously unavailable.  It was therefore necessary for Title III's enforcement provision to reference the Attorney General expressly.  The considerations surrounding Title I and Title III are thus inapplicable to Title II because Congress was tracking the language of the Rehabilitation Act's enforcement provision.  *See Sec'y Fla. Agency*, 21 F.4th at 743-745 (opinion of Jill Pryor, J.).[5]

---

[5] It is true that the Supreme Court never discussed the Attorney General's Title II enforcement authority in any of the cases identified by Defendants.  *See* ECF No. 28-1 at 9 n.23.  But that is

C.      Gregory*'s Federalism-Based Canon of Statutory Construction Does Not Counsel in Favor of a Different Interpretation.*

In claiming that the Attorney General cannot enforce Title II, Defendants also invoke *Gregory v. Ashcroft*, 501 U.S. 452 (1991), which held that Congress must use "unmistakably clear" language if it wants to "alter the usual constitutional balance" between the federal government and the states. *Id.* at 460, 463-64. Defendants' reliance on this federalism-based canon of statutory interpretation fails for two independent reasons.

First, *Gregory*'s clear-statement rule does not apply here because permitting the federal government to enforce Title II against states does not "alter the usual constitutional balance." *Id.* at 460. The Supreme Court has repeatedly recognized that "[i]n ratifying the Constitution, the States consented to suits brought by . . . the Federal Government." *Alden v. Maine*, 527 U.S. 706, 755 (1999); *see, e.g.*, *United States v. Mississippi*, 380 U.S. 128, 140 (1965) (no "provision of the Constitution prevents or has ever been seriously supposed to prevent a State's being sued by the United States"); *United States v. Texas*, 143 U.S. 621, 645-46 (1892) (suit by the United States against a state "does no violence to the inherent nature of sovereignty"). Indeed, statutes authorizing the United States to bring suits against states are commonplace: in the anti-discrimination context alone, they include not only Title VI and the Rehabilitation Act but also Title VII, 42 U.S.C. § 2000e-5(f)(1), Title I of the ADA, 42 U.S.C. § 12112(2) and (5), 12112(a), and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc-2(f), among others.

Second, even if *Gregory* did apply, its clear-statement rule would be satisfied. For all the

---

because the United States' authority was irrelevant to the resolution of the issues before the Court, all of which were brought by private parties. *See, e.g.*, *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 159-60 (2017).

reasons discussed above, Title II's text clearly demonstrates that Congress intended to provide victims of discrimination the full range of well-established remedies, procedures, and rights available under Title VI and the Rehabilitation Act, including the right to pursue administrative proceedings that could culminate in a civil action by the Attorney General.

## II.    Title II Applies to Defendants' Implementation and Enforcement of the Aggravated Prostitution Law.

Title II's broad scope covers the implementation and enforcement of the aggravated prostitution law.  Defendants seek to narrow this scope using textual, structural, and legislative history interpretations that do not withstand logic or precedent.

### A.    *Title II's "Programs, Services, and Activities" Language Encompasses Defendants' Conduct.*

Beginning with the plain text, Title II states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The term "qualified individual with a disability" means "an individual with a disability who . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  *Id.* § 12131(2).  The term "services, programs, or activities" has the same broad meaning as "[p]rogram or activity" in Section 504 of the Rehabilitation Act of 1973, Pub. L. No. 93-112, 87 Stat. 355 (29 U.S.C. 701 *et seq.*), which was defined as "all of the operations of" a covered entity.  29 U.S.C. § 794(b).[6]  And the term "services, programs, or activities" is broadly

---

[6] Title II was modeled after Section 504, and because Congress directed that Title II should not "be construed to apply a lesser standard than the standards applied under" Section 504 the phrase "service, programs, or activities" carries a similarly broad meaning under the ADA.  *See* 42 U.S.C. § 12201(a); *Bragdon*, 524 U.S. at 631-32 (discussing the "lesser standard" principle);

construed in the Title II regulations to include "anything a public entity does." 28 C.F.R. pt. 35,

app. A at 690.

The Supreme Court has already determined that Title II covers core government

functions, contrary to Defendants' assertion.  ECF No. 28-1 at 17.  In *Pennsylvania Department*

*of Corrections v. Yeskey*, the Supreme Court held that Title II covers the maintenance of penal

institutions.  524 U.S. 206, 209 (1998)*.*  The Court reasoned that while "one of the primary

functions of government . . . is the preservation of societal order through enforcement of the

criminal law," Title II "unmistakably" covers the management of state prisons.  *Id.* (cleaned up);

*cf. Thompson v. Davis*, 295 F.3d 890, 897 (9th Cir. 2002) ("many functions traditionally reserved

to the states are subject to the ADA," including the states' powers to "fashion and enforce

criminal laws"); *see also Where Do We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 861

(9th Cir. 2022) (concluding that agency's forcible clearance of homeless encampments on

private property was a program under Title II); *Armstrong v. Wilson*, 124 F.3d 1019, 1023-24

(9th Cir. 1997) (explaining that activities by law enforcement and correctional facilities are

covered by Title II).[7]

The Sixth Circuit has also concluded that Title II's "programs, services, and activities"

---

*Johnson v. City of Saline*, 151 F.3d 564, 570 (6th Cir. 1998) (citing Section 504's definition of "program or activity").

[7] This interpretation and rationale also track with decisions by other courts that have concluded that other "traditional" state functions, such as zoning and licensing, are covered as programs, services, and activities under Title II.  *See, e.g.*, *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 332-33 (6th Cir. 2002) (analyzing plaintiffs' standing in challenge to a facially discriminatory ordinance); *Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, 300 F.3d 775, 782 (7th Cir. 2002) (concluding Title II applies to zoning ordinances); *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 48-49 (2d Cir. 1997), *recognized as superseded on other grounds*, *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 171 n.7 (2d Cir. 2001) (concluding that a clinic could state a claim under Title II based on "be[ing] denied the benefit of having the City make a zoning decision without regard to the disabilities of [the clinic]'s

language provides broad coverage.  In *Johnson v. City of Saline*, the Sixth Circuit held that "the phrase 'services, programs, or activities' encompasses virtually everything that a public entity does." 151 F.3d 564, 569 (6th Cir. 1998).  There, the Sixth Circuit considered whether Title II applied when a public entity essentially served as a landlord to a person who operated a public access cable station rent-free in the entity's facilities.  *Id.* at 566-67.  The city argued that Title II did not cover the plaintiff's claim, as the station was not open to the public and so "was not a service, program, or activity of a public entity" for which reasonable accommodations needed to be provided.  *Id.* at 569.  The Sixth Circuit rejected this argument, reasoning that "(1) the discrimination referenced in the statute must *relate to* services, programs, or activities; and (2) services, programs, and activities *include all government activities*."  *Id.* at 569 (emphasis added).  The Sixth Circuit grounded its conclusion in simple statutory interpretation principles: "the word 'activities,' on its face, suggests great breadth and offers little basis to exclude any actions of a public entity."  *Id.* at 570.

Consistent with this precedent, Title II covers Tennessee's implementation of its aggravated prostitution law.  The State and the TBI engage in activities related to implementation of the aggravated prostitution law, including enforcing the law and its associated sex offender registry requirements.  The State's activity thus causes often lifelong discrimination faced by people convicted of aggravated prostitution, as alleged in the United States' complaint.

Defendants make a series of arguments attempting to narrow the breadth of Title II, none of which accord with *Yeskey* and *Johnson.*  Their assertion that Title II applies only to a public entity's "benefits," ECF No. 28-1 at 18, does not limit coverage, consistent with the Supreme

---

clients"); *Hason v. Med. Bd. of Cal.*, 279 F.3d 1167, 1172-73 (9th Cir. 2002) (concluding that medical licensing is covered by Title II).

Court's broad construction of the term in *Yeskey*.   The Court concluded that prisons provide services, programs, and activities that "at least theoretically 'benefit' the prisoners (and any of which disabled prisoners could be 'excluded from participation in')."   524 U.S. at 210. Individuals in Tennessee arguably benefit from the State maintaining and enforcing a criminal code.   In any event, the plain language of Title II not only prohibits public entities from denying the "benefits" of their programs, services, or activities, but also provides that individuals may not "be subjected to discrimination" based on disability in those programs, services, or activities.   42 U.S.C. § 12132.

Defendants also try to constrict Title II by discussing *Zimmerman* and *Elwell*, cases that discuss Title II's coverage of a public entity's provision of "outputs."   ECF No. 28-1 at 17 (citing *Zimmerman v. Oregon Department of Justice*, 170 F.3d 1169 (9th Cir. 1999), *Elwell v. Oklahoma ex rel Bd. of Regents of University of Oklahoma*, 693 F.3d 1303 (10th Cir. 2012)). But these cases do not support the contention that the enforcement of a discriminatory state law falls outside the scope of Title II.   In *Zimmerman*, the Ninth Circuit considered whether Title II covers employment.   The court concluded that Title II has an "outward-looking focus" and applies to the "outputs" of a public agency, like operation of a parks department's programs, not its "inputs," such as employment of the department's employees.   170 F.3d at 1174, 1181; *see also Elwell*, 693 F.3d at 1306 (outputs do not include employment).[8]   Tennessee implements and enforces state criminal law, which impacts the public.   Thus, even under *Zimmerman*'s "outputs"

---

[8] Title I of the ADA expressly addresses discrimination against employees by certain employers.   The court in *Zimmerman* concluded that Title II did not cover employment because Title I of the ADA "contains detailed and comprehensive employment provisions" and "Congress consciously and expressly chose to include the employment practices of state and local governments in Title I."   170 F.3d at 1176-77; *see also Elwell*, 693 F.3d at 1309-10 (discussing why "Title I, not Title II, is the proper tool for pursuing employment discrimination claims.").

rationale, Title II covers these outward-facing activities because they impact the public in a way that state employment does not.

B.     *Interpretation of Title II's "Residual" or "Catchall" Clause is Unnecessary to Resolve the Issue of Coverage.*

Defendants also focus on Title II's "residual" or "catchall" clause—the "or be subjected to discrimination by any such entity" language that comes after the "services, programs, or activities" language in Title II.  42 U.S.C. § 12132.  Defendants claim that this clause cannot cover more than intentional discrimination in a public entity's "outputs," based on the words around the residual clause and the meaning of other terms in Title II.[9]  ECF No. 28-1 at 19.  The Court need not reach this argument, because, as discussed above, Defendants' implementation and enforcement of the aggravated prostitution law fall within Title II's "program, service, or activity" language.

Nonetheless, several courts have rejected narrow interpretations of the residual clause like those advanced by Defendants and interpreted the clause expansively to cover *all* discrimination by a public entity.  *See Haberle v. Troxell*, 885 F.3d 171, 180 (3d Cir. 2018) (explaining that the "subjected to discrimination" phrase in Title II is "a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context" (quoting *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1085 (11th Cir. 2007)); *Innovative Health Sys., Inc.*, 117 F.3d at 44-45 ("it is a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context").

Defendants thus present no compelling argument as to why the implementation and

---

[9] Defendants also argue that the statutory heading for Title II, "Public Services," somehow narrows its reach.  ECF No. 28-1 at 20.  But this argument was already rejected in *Yeskey*.  524 U.S. at 212.

enforcement of a state's criminal law is exempted from coverage under the plain language of Title II of the ADA.[10]

C.       *Legislative History Does Not Contradict Title II's Application in this Context.*

Defendants' final attempt to defeat the clear statutory language and binding precedent establishing coverage under Title II through an unfounded reading of the legislative history, ECF No. 28-1 at 20-21, is unavailing.  Defendants assert that because the legislative record does not explicitly mention a state criminal law that discriminates against individuals because of their HIV status, such a law is not covered.  This absurd reading of the ADA's protections as extending no further than the specific examples presented in its legislative history ignores the plain statutory text as well as the fact that "Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systematic deprivations of fundamental rights." *Lane*, 541 U.S. at 524.  Among other things, Title II was meant to address "a pattern of unconstitutional treatment in the administration of justice." *Id.* at 525; *see also Bay Area Addiction Rsch. & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 731 (9th Cir.1999) (explaining that the legislative history of the ADA "strongly suggests that Section 12132 should not be construed to allow the creation of spheres in which public entities may discriminate on the basis of an individual's disability").  As the Ninth Circuit

---

[10] Defendants also summarily state that the United States "has not alleged that individuals with disabilities are denied public benefits that they otherwise qualify for."  ECF No. 28-1 at 22. The United States does not dispute that Title II protects only "qualified individual[s]" who meet the "the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131, 12131(2).  But people living with HIV who engage in sex work *qualify* and meet eligibility requirements for application of the state's criminal law to their conduct.  As the Court in *Yeskey* explained, a program, service, or activity need not be voluntary for a person to be "eligible" for it.  524 U.S. at 211 (explaining that "[a] drug addict convicted of drug possession, for example, might, as part of his sentence, be required to 'participate' in a drug treatment program for which only addicts are 'eligible'").

observed, "[f]acially discriminatory laws present per se violations of § 12132," *Bay Area Addiction Rsch. & Treatment, Inc.*, 179 F.3d at 735, and this includes criminal laws that subject people with disabilities to different and harsher punishment.  Accordingly, Defendants' cherry-picked view of legislative history examples should not overcome the text of Title II and controlling precedent in *Yeskey* and *Johnson*, which support broad application of Title II, including in areas of criminal law enforcement.

III.    **The United States Has Standing to Sue Tennessee and the TBI.**

The United States has Article III standing to pursue relief against Defendants under the ADA.  Importantly, Defendants have not cited any case in which the government has been denied standing to enforce its own law.  When Congress enacts a law prohibiting certain conduct, a violation of that statute inherently constitutes an injury to the United States for purposes of establishing Article III standing.  *See Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) (holding that an injury to the United States satisfies Article III standing requirements); *see also Trivette v. Tenn. Dep't of Corrs.*, No. 3:20-cv-00276, 2023 WL 3635706, at *1 (M.D. Tenn. May 24, 2023) ("Typically, the government has standing to enforce its own laws.") (cleaned up); *Bureau of Consumer Fin. Prot. v. Fifth Third Bank, N.A.*, No. 1:21-cv-262, 2023 WL 7325956, at *9 (S.D. Ohio Sept. 26, 2023) (same).  In addition, because the United States has stated a claim that Defendants violated Title II by maintaining and enforcing the aggravated prostitution law, the United States has satisfied the Article III requirements of "traceability" and "redressability."  *See* Compl. ¶¶ 2, 74.

Contrary to Defendants' assertions, ECF No. 28-1 at 22, the enforcement of Tennessee's aggravated prostitution law encompasses multiple actions by Tennessee and the TBI that should be enjoined in this suit.  Although local district attorneys "prosecute" violations of state criminal

statutes, Tenn. Code Ann. § 8-7-103, Tennessee incarcerates individuals convicted of aggravated

prosecution for a period of three to 15 years, *see id.* § 40-35-111(b)(3); Compl. ¶ 17. Tennessee,

through the TBI, maintains and publishes a publicly searchable, centralized record system of

those convicted of sexual offenses, including aggravated prostitution.[11] *See* Compl. ¶¶ 19, 35-

36; Tenn. Code Ann. § 40-39-204(a). The TBI also notifies law enforcement when individuals

are not in compliance with the registration requirements, *see* Tenn. Code Ann. § 40-39-206(b),

and determines whether a registrant is a "sexual offender" or "violent sexual offender," which

affects the length of the individual's registry requirement, *see id.* §§ 40-39-202(19), (20), (30).

Tennessee enforces the law's reporting requirements. *See id.* § 40-39-204; -305; -203(a)(1), (6).

And Tennessee issues driver's licenses indicating that an individual is a "violent" sexual

offender. *See id.* §§ 49-39-213(a)-(b); Compl. ¶ 34. Each of these alleged actions harms

individuals with disabilities and violates the ADA, and the injunctive relief the United States

seeks would redress these harms.

Defendants are incorrect that enjoining Tennessee and the TBI would present

redressability concerns regarding the Court binding "nonparties who are in active concert with a

defendant." ECF No. 28-1 at 23-24 (citing *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1255

(11th Cir. 2020) (cleaned up)). Because states are the entities responsible for maintaining and

enforcing laws, courts commonly find them to be proper defendants in suits brought by the

United States, and courts likewise enjoin states from enforcing state laws. *See e.g.*, *Arizona v.*

*United States*, 567 U.S. 387, 416 (2012) (affirming in part the grant of a preliminary injunction

against Arizona for enforcing state immigration laws); *United States v. California*, 921 F.3d 865,

---

[11] Defendants do not contest that TBI maintains and operates the Sexual Offender Registry. *See* ECF No. 28-1 at 23 ("[The federal government" has standing to challenge TN-SORA only to the extent that it alleges harms from the aspects of the TN-SORA that TBI oversees.").

894-95 (9th Cir. 2019) (reversing in part the denial of a preliminary injunction against California to prevent enforcement of a state immigration law); *United States v. South Carolina*, 840 F. Supp. 2d 898, 926-27 (D.S.C. 2011) (granting a preliminary injunction enjoining South Carolina from enforcing certain provisions of an immigration law); *United States v. Florida*, 682 F. Supp. 3d 1172 (S.D. Fla. 2023) (issuing an injunction against Florida to prevent disability-based discrimination under Title II against children with complex medical needs), *appeal pending*, No. 23-12331 (11th Cir.).

The cases Defendants cite are not to the contrary; they involve litigation brought by *private plaintiffs* against *state officials* who did not have enforcement authority over the challenged law or policy.  ECF No. 28-1 at 23 (citing *Whole Women's Health v. Jackson*, 141 S. Ct. 2494 (2021) (abortion providers sued judges and other Texas officials to stop enforcement of abortion law); *Scott v. Donald*, 165 U.S. 107 (1897) (importer of wine and liquor sued South Carolina constables to stop enforcement of liquor law); *L.W. by & through Williams v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023) (doctors sued state officials regarding restrictions on medical care for transgender minors); *Jacobson*, 974 F.3d at 1255 (voters and political organizations sued Florida Secretary of State to challenge constitutionality of voting statute); *Hollingsworth v. Perry*, 570 U.S. 693 (2013) (same-sex couples sued California officials to challenge law prohibiting same-sex marriage)).  Because private plaintiffs seeking injunctive relief against state agencies are limited by sovereign immunity to suing only state officials in their official capacity, *see Ex parte Young*, 209 U.S. 123 (1908), courts must take extra care in those cases to ensure that the named defendants are responsible for enforcing the challenged law or policy.  Here, by contrast, the United States has named the State (and a state agency) as defendants, as it is permitted to do consistent with the Eleventh Amendment.

22

Because Defendants are responsible for the statutory violations alleged in the United States' Complaint, and there are no concerns that redressing these violations would require this Court to bind nonparties, Tennessee and the TBI are proper defendants.[12]

## IV.    Challenges to the United States' Requested Relief are Misplaced and Inappropriate at this Stage.

The United States seeks relief tailored to redress Defendants' discrimination. Defendants' assertions to the contrary, ECF No. 28-1 at 24-25, are not only wrong but also improperly raised in a motion to dismiss.

Under the Federal Rules of Civil Procedure, "a court may dismiss a complaint only if it is clear that *no* relief could be granted under *any* set of facts that could be proved consistent with the allegations." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002) (emphasis added) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)). As discussed, the United States can bring this suit, has stated a claim, and has standing to pursue relief against Defendants. Dismissal is unwarranted. A challenge to the United States' prayer for relief is improper in a Rule 12(b)(6) motion. *See, e.g.*, *Kruse v. Repp*, 611 F. Supp. 3d 666, 724 (S.D. Iowa 2020) ("[T]he pleading of a claim entitling a plaintiff to relief under Rule 8(a)(2) is distinct from a request for a particular remedy under Rule 8(a)(3)—the former is subject to dismissal under Rule

---

[12] Tennessee also mistakenly cites cases filed by private plaintiffs against *federal* agency officials. ECF No. 28-1 at 23 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013); *Regal Knitwear Co. v. NLRB*, 324 U.S. 9 (1945); *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)). In *Lujan*, for example, plaintiffs sought to challenge federal agency funding of overseas environmental projects. Rather than challenging agencies' funding decisions, plaintiffs challenged only the Secretary of Interior's regulation requiring that those agencies consult the Department of Interior before funding projects. *Lujan*, 504 U.S. at 568-69. The Supreme Court concluded that Article III's redressability requirements were not satisfied because plaintiffs sought to bind agencies that were not parties to the case. *Id.* at 569. These cases are inapplicable to the instant litigation because Tennessee maintains and enforces its aggravated prostitution law, and the United States has named Tennessee as defendant.

12(b)(6) (i.e. 'failure to state a *claim*') while the latter is not."); *Moratorium Now! v. Detroit 300 Conservancy*, No. 15-CV-10373, 2015 WL 11005026, at *2 (E.D. Mich. July 22, 2015) (explaining that Rule 12(b)(6) permits seeking dismissal of a claim, not dismissal of a demand for relief).

This is illustrated in *Hogue v. American Paper Optics, LLC*, for instance, where this district court observed that Rule 12 motions "evaluate[] whether a complaint contains sufficient factual matter to state a *claim* to relief, as opposed to the remedies sought in the demand for relief." No. 2:17-cv-02670, 2019 WL 1313447, at *3 (W.D. Tenn. Jan. 14, 2019) (citing *Dingxi Longhai Dairy, Ltd. v. Becwood Tech. Grp. LLC*, 635 F.3d 1106, 1108-09 (8th Cir. 2011)). The *Hogue* court declined to dismiss a plaintiff's request for a disgorgement of profits, noting that the "pleading stage is not the appropriate time for the Court to make rulings on the amount or type of damages or other relief which may be available in the event the [defendant] prevail[s] on any of [its] claims." *Id.* (quoting *Nutrimost Doctors, LLC v. Sterling*, No. 16-cv-13844, 2018 WL 1570624, at *9 (E.D. Mich. Mar. 30, 2018).[13]

Permitting this case to proceed does not, of course, force the crafting of a remedy that goes beyond the scope of the violations proven. Accordingly, Defendants' arguments about the scope of relief should be rejected and the motion denied.[14]

---

[13] Fed. R. Civ. P. 54(c) underscores the inappropriateness of Defendants' arguments: this rule provides that a prevailing party may obtain any relief, even when not demanded in the pleadings. *Bontkowski v. Smith*, 305 F.3d 757, 762 (7th Cir. 2002); *cf. Pension Benefits Guar. Corp. v. E. Dayton Tool & Die Co.*, 14 F.3d 1122, 1127 (6th Cir. 1994) (cleaned up) ("If a pleading provides a defendant notice of the plaintiff's claims and the grounds for the claims, omissions in a prayer for relief do not bar redress of meritorious claims.").

[14] Even so, the United States has sought and received declaratory and injunctive relief against public entities, including states, who violate federal law. *See* Section III *supra*; *see, e.g.*, *United States v. City of Baltimore*, 845 F. Supp. 2d 640, 642 (D. Md. 2012) (ordering zoning code to be amended by City Council legislation or order of Court, in case in which United States sought

24

## CONCLUSION

For these reasons, the United States requests that the Court deny Defendants' Motion to

Dismiss, ECF No. 28.


Dated: May 22, 2024                              REBECCA B. BOND
                                                 Chief

                                                 */s/ Stephanie Berger*
                                                 KEVIN KIJEWSKI
                                                 Deputy Chief
                                                 STEPHANIE M. BERGER
                                                 NY Bar #5201439
                                                 ALI N. SZEMANSKI
                                                 PA Bar #327769
                                                 ANNA G. BOBROW
                                                 DC Bar #1743249
                                                 Trial Attorneys
                                                 Disability Rights Section
                                                 Civil Rights Division
                                                 U.S. Department of Justice
                                                 150 M Street NE
                                                 Washington, D.C. 20002
                                                 202-307-0663
                                                 Stephanie.Berger@usdoj.gov
                                                 Ali.Szemanski@usdoj.gov
                                                 Anna.Bobrow@usdoj.gov

                                                 *Counsel for United States*

---

declaration that zoning code provision was facially discriminatory). In addition, declaratory and injunctive relief is appropriate when state laws and policies discriminate. *See Hargrave v. Vermont*, 340 F.3d 27, 30 (2d Cir. 2003) (affirming judgment and permanent injunction of state durable power of attorney for health care law that "facially discriminated" against individuals with mental health disabilities in violation of Title II); *Galloway v. Superior Ct. of D.C.*, 816 F. Supp. 12, 20 (D.D.C. 1993) (declaring invalid and enjoining policy that categorically excluded blind individuals from serving as jurors); *T.E.P. v. Leavitt*, 840 F. Supp. 110, 111 (D. Utah 1993) (enjoining enforcement of state law under ADA that prohibited marriage by persons with acquired immunodeficiency syndrome). Finally, because the Attorney General has authority to enforce Title II of the ADA, it may also seek compensatory damages consistent with the Supreme Court's decision in *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and exact copy of the foregoing was filed and served via the

Court's electronic filing system on this the 22nd day of May 2024, upon:

Cody N. Brandon
Managing Attorney
Assistant Attorney General

David M. Rudolph
Senior Assistant Attorney General

Law Enforcement &
Special Prosecutions Division
Office of the Tennessee
Attorney General & Reporter
500 Charlotte Avenue
Nashville, TN 37202
Off. (615) 532-2552
Fax (615) 532-4892

Cody.Brandon@ag.tn.gov
David.Rudolph@ag.tn.gov
*Counsel for Defendants*

Alexis Agathocleous
Alexis Alvarez
Jon W. Davidson
Rachel Meeropol
AMERICAN CIVIL LIBERTIES UNION
125 Broad St., New York, NY 10004
Phone: (929) 585-0061
AAgathocleous@aclu.org
AlexisA@aclus.org
JonDavidson@aclu.org
RMeeropol@aclu.org

Stella Yarbrough
Jeff Preptit
Lucas Cameron-Vaughn
ACLU FOUNDATION OF TENNESSEE
P.O. Box 120160
Nashville, TN 37212
Phone: (615) 320-7142
SYarbrough@aclu-tn.org
JPreptit@aclu-tn.org
Lucas@aclu-tn.org

Lynly S. Egyes
Milo Inglehart
TRANSGENDER LAW CENTER
594 Dean Street, Suite 11
Brooklyn, NY 11238
Phone: 510 587-9898 Ext. 353
Lynly@transgenderlawcenter.org
Milo@transgenderlawcenter.org

Dale Melchert
TRANSGENDER LAW CENTER
P.O. Box 70976
Oakland, CA 94612
Phone: (510) 587-9696 Ext. 354
Dale@transgenderlawcenter.org
*Counsel for Plaintiffs OUTMemphis, Michelle Anderson, Jane Doe 2, Jane Doe 3, and Jane Doe 4*

*/s/ Stephanie Berger*
Stephanie Berger